**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOHN DOE,<br>　　　　　*Petitioner-Appellant*,<br><br>　　　　　v.<br><br>ROBERT L. AYERS, JR., Warden, of<br>California State Prison at San<br>Quentin,<br>　　　　　*Respondent-Appellee*. | No. 15-99006<br><br>D.C. No.<br>[Redacted]<br><br><br>OPINION |

Appeal from the United States District Court
for the [Redacted] District of California
[Redacted], District Judge, Presiding

Argued and Submitted [Redacted]
[Redacted]

Filed March 31, 2015

Before: Harry Pregerson, Stephen Reinhardt,
and Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge Reinhardt

## SUMMARY[*]

### Habeas Corpus/Death Penalty

The panel affirmed in part and reversed in part the district court's judgment on California state prisoner John Doe's habeas corpus petition challenging his murder conviction and capital sentence, and remanded with instructions to grant the writ with respect to the penalty phase and return the case to the state court to reduce Doe's sentence to life without parole, unless the state elects to pursue a new capital sentencing proceeding within a reasonable amount of time as determined by the district court.

The panel wrote that because Doe filed his petition prior to the passage of the Antiterrorism and Effective Death Penalty Act of 1996, the parties agree that his petition is governed by pre-AEDPA standards of review.

The panel agreed with the district court that Doe is not entitled to reversal of his conviction on the basis of the claims presented in the petition: ineffective assistance of counsel during the guilt phase, use of peremptory strikes in a racially discriminatory matter in violation of *Batson v. Kentucky*, improper withholding of impeachment evidence in violation of *Brady v. Maryland*, extraneous evidence of prior crimes, and cumulative prejudice.

The panel agreed with the district court that counsel was ineffective in failing to investigate and present mitigating

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

evidence at the penalty phase. The panel wrote that the evidence that counsel's performance at the penalty phase fell well below the constitutional minimum is overwhelming.

The panel held that there is a substantial probability that there would have been a different result at the penalty phase had counsel's performance not been ineffective, and that the district court therefore erred in concluding that counsel's deficient performance did not prejudice Doe. The panel wrote that the aggravating evidence the jury considered was, for a capital case, fairly minimal, and that counsel's penalty-phase evidentiary presentation was brief, haphazard, and thoroughly underwhelming. The panel wrote that the powerful evidence introduced in the habeas proceedings at the district court represented the fruits of an appropriate mitigation investigation, and concluded that the evidence of Doe's repeated rape in prison as a youngster and its detrimental effects on his mental health is sufficient to establish prejudice. The panel wrote that additional mitigating evidence of Doe's abusive childhood and substance abuse, which counsel likewise failed to present, only strengthens that conclusion. The panel wrote that its finding of prejudice is supported by a comparison with other capital cases, and rejected the state's arguments, regarding causal nexus and rebuttal evidence, against the conclusion that counsel's deficient penalty-phase performance prejudiced Doe.

## COUNSEL

John R. Grele (argued), Tiburon, California; and David W. Fermino, Sideman & Bancroft, San Francisco, California, for Petitioner-Appellant.

Barry J. Carlton (argued), Supervising Deputy Attorney General, San Diego, California, for Respondent-Appellee.

## OPINION

REINHARDT, Circuit Judge:

### I. Introduction

In 1984, a house in California was burglarized and a number of items were stolen. K.H. and M.H. resided there with M.H.'s young children, a live-in babysitter, L.R., and her daughter. Petitioner John Doe,[1] who was living at the time in a vacant house adjacent to the property, was arrested in connection with the burglary, but then released.

Soon after, while K.H. and M.H. were not at home, their house was burglarized again. L.R. was murdered, having been beaten, stabbed, and strangled. Her body was found supine on the bed in the master bedroom, with her hands bound behind her back. She was naked from the waist down, with her legs open, and a vibrator near her body. A number of items were stolen.

---

[1] In this case, we discuss disturbing evidence of sexual abuse suffered by the Petitioner. Because of the possibility that publication of this information might place him at risk in a prison environment, much of the record in this habeas proceeding was filed under seal. However, this case turns on the weight of the evidence that trial counsel failed to discover and present; it is powerful in large part because of the painful details. After considering the views of the parties, we have ordered the record unsealed for the limited purpose of discussing the evidence in this opinion, but have replaced Petitioner's name with Doe and the names of others with initials. We have also omitted citations to the procedural history of this case.

After an investigation, Doe was arrested. He was charged with one count of murder and two counts of burglarizing the home. Special circumstances of felony-murder-burglary and felony-murder-rape were alleged; also alleged was a prior felony conviction for an armed robbery committed in the Southern state where Doe grew up. J.B., who had never before worked on a case in which the death penalty was at issue, was appointed to represent Doe.[2] He hired an investigator, D.S., who interviewed potential witnesses in California and in Doe's home state.[3]

Doe pleaded not guilty to the charges and denied the allegations. The jury returned verdicts finding Doe guilty of murder and both counts of burglary. The jury also rendered a finding of true on the felony-murder-burglary special-circumstance allegation, and a finding of not true on the felony-murder-rape special-circumstance allegation. At the penalty phase, the jury returned a sentence of death.[4]

---

[2] J.B. also stated that he had "never observed the penalty phase of a trial or mock trial."

[3] For the sake of clarity, we include a brief timeline of Doe's life and criminal history. He grew up in the South. In 1976, at the age of 17, he was convicted of robbery and incarcerated in a state prison. He was released in 1982. By 1983, Doe had moved to California; he was convicted of murder there in 1984.

[4] In California, a capital trial consists of two phases. In the first, the guilt phase, the jury decides whether the defendant committed murder and also whether one of a number of special circumstances applies. If the jury determines that the defendant is guilty and that one of the special circumstances applies in the case, a separate penalty phase commences. In that phase, the jury weighs aggravating and mitigating evidence to determine whether the death penalty is appropriate. *Tuilaepa v. California*, 512 U.S. 967, 969 (1994) (citing Cal. Penal Code § 190.3). The Supreme

The California Supreme Court denied Doe's direct appeal, and the Supreme Court denied his petition for certiorari. The California Supreme Court also denied Doe's habeas petition, twice.

Doe filed a federal habeas petition, which was also denied. The district court affirmed the conviction, rejecting a number of guilt-phase challenges. As for Doe's claim that he had received ineffective assistance of counsel at the penalty phase of his trial, the court found that counsel for Doe had performed deficiently in failing to investigate and present various categories of mitigating evidence. However, the district court concluded that Doe could not establish that he had been prejudiced as a result, as required under *Strickland v. Washington*, 466 U.S. 668, 695 (1984).

We agree with the district court that Doe is not entitled to reversal of his conviction on the basis of the claims presented in the petition before us. With respect to the penalty-phase claim, we agree that defense counsel was ineffective but disagree with the conclusion that Doe was not prejudiced. Accordingly, we affirm Doe's conviction but reverse as to his sentence, and instruct the district court to grant the writ.

---

Court has long recognized that such bifurcated trials serve an important role in ensuring that "the determination of punishment [in capital cases] . . . reflect[s] 'the evolving standards of decency that mark the progress of a maturing society[,]'" because "[m]uch of the information that is relevant to the sentencing decision may have no relevance to the question of guilt, or may even be extremely prejudicial to a fair determination of that question." *Gregg v. Georgia*, 428 U.S. 153, 190 (1976) (citations omitted).

## II. Standard of Review

This case is unusual in that Doe filed his federal habeas petition in 1995, prior to the passage of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Accordingly, the parties agree that his petition is governed by pre-AEDPA standards of review. *See Comer v. Schriro*, 480 F.3d 960, 980 (9th Cir. 2007). "Under these standards state court judgments of conviction and sentence carry a presumption of finality and legality and may be set aside only when a state prisoner carries his burden of proving that his detention violates the fundamental liberties of the person, safeguarded against state action by the Federal Constitution." *Id.* (citations and internal quotation marks omitted). "A state court's conclusion that a constitutional error was harmless is reviewed de novo." *Daniels v. Woodford*, 428 F.3d 1181, 1196 (9th Cir. 2005). In this analysis, the additional deference required by AEDPA does not apply.

This court reviews de novo the district court's denial of habeas relief. *See Alcala v. Woodford*, 334 F.3d 862, 868 (9th Cir. 2003). Underlying factual determinations made by the district court are reviewed for clear error. *See Hovey v. Ayers*, 458 F.3d 892, 900 (9th Cir. 2006). Determinations by the district court of legal questions or mixed questions of law and fact are reviewed de novo. *Frierson v. Woodford*, 463 F.3d 982, 988 (9th Cir. 2006).

## III. Guilt-Phase Claims

In the petition before us, Doe raises a number of challenges to his conviction, all of which were rejected by the district court. We discuss these claims only briefly, as we agree with the result reached by the district court.

## A. Rule 60(b)

First, Doe asserts that the district court abused its discretion in denying his motion to vacate the judgment in which it denied his habeas petition under Fed. R. Civ. P. 60(b). Doe requested relief under Rule 60(b) based on newly discovered physical evidence that was in the possession of the state. He alleges that the state withheld from his prior habeas counsel DNA and fingerprint evidence from the crime scene and from a related murder that it tested post-trial and was not a match to Doe. He also alleges that his prior habeas counsel was negligent in failing to pursue claims based on this evidence once she learned of it.

Doe's Rule 60(b) claims have a complicated procedural history:

In March 2005, while the present petition was still pending before the district court, Doe sent a letter to the court stating that he no longer wanted his appointed attorneys to continue to represent him, in part because they refused to investigate his claims of actual innocence. Two weeks after he reiterated that request in June, the district court denied Doe's request, and simultaneously denied his habeas petition. Doe appealed the denial of his motion for substitution of counsel, and we appointed new (present) habeas counsel, who filed his Rule 60(b) motion; the district court denied it. After consolidating Doe's appeals, we held that the district court had abused its discretion in denying Doe's request for substitution of counsel. We vacated the district court's denial of this request, together with its denial of Doe's petition for writ of habeas corpus, and remanded for further proceedings in which Doe's newly-appointed counsel would have the

opportunity to make additional submissions to the district court.

The Supreme Court granted certiorari and reversed.**[5]** It concluded that we had erred in holding that the district court abused its discretion in rejecting Doe's request for new counsel. In so doing, it noted that the evidence at issue "might have established a *Brady* claim, a claim of ineffective assistance of counsel for failure to adequately investigate the murder, or a claim of innocence, especially given that no physical evidence tied Doe to the crime and that he was convicted based in part on recanted testimony. The Court went on to say, however, that all of those claims would have been new, and that as the district court subsequently found in ruling on the Rule 60(b) motion, the physical evidence was not related to the claims previously presented in Doe's habeas petition. Because these claims were new claims for relief on the merits, and did not attack a defect in the integrity of the proceedings, Doe was required to raise them not in a Rule 60(b) motion, but in a successive habeas petition. *Gonzalez v. Crosby*, 545 U.S. 524, 529–32 (2005).**[6]** We therefore do not consider them here, but may do so in the future if Doe is

---

**[5]** Citation omitted.

**[6]** We note that Doe may still timely bring such a petition, because he filed – and we accepted as a protective petition under *Pace v. DiGuglielmo*, 544 U.S. 408, 416 (2005) – an application to file an amended successor petition. Proceedings on that petition were stayed pending resolution of this one; once the mandate issues in the case we now consider, we will determine whether Doe's successive petition makes a prima facie showing under the actual innocence prong of 28 U.S.C. § 2244(b)(2)(B). *See Thompson v. Calderon*, 151 F.3d 918, 923–25 (9th Cir. 1998) (en banc).

subsequently granted the right to file a second or successive petition.

## B. Ineffective Assistance of Counsel

Second, Doe alleges that his trial counsel, J.B., provided ineffective assistance of counsel during the guilt phase of his trial. J.B.'s performance at the guilt phase of Doe's trial was certainly subpar. He failed to interview two young children who were the only eyewitnesses to the murder and who, in initial police reports, identified the killer as white (Doe is black). Although the failure to even interview the only eyewitnesses to the crime was unquestionably deficient performance, J.B. did offer a couple of reasonable justifications for his decision not to put them on as witnesses: the children appeared unreliable, and the prosecutor agreed not to tell the jury that children were present at the time of the murder if J.B. did not call them to testify.[7]

J.B. also failed to follow up on a potential alibi witness, C.L., with whom Doe claimed that he had gone drinking the night of the murder. During an interview with D.S., C.L. said that it was more likely than not that Doe was with him at a local bar on the night of the murder, given that the murder occurred on a Thursday and C.L. and Doe always went out drinking on Thursday nights. Because C.L. had no specific recollection of that particular evening, he told D.S. that he would attempt to find more definite support for the alibi. D.S. provided J.B. with a copy of a report summarizing his interview with C.L.; however, J.B. never attempted to contact

---

[7] It also appears the J.B. may have wanted to avoid traumatizing the children, which would not have been a legitimate reason for deciding not to call them.

C.L. again until, just before trial, when he tried to subpoena him as a trial witness.[8] Then, when service was initially unsuccessful, J.B. made no further attempt to track him down. J.B. also acted in an objectively unreasonable way when he failed to call a blood spatter expert who stated in his report that had Doe committed the murder, he would have been spattered with blood. J.B. never asserted a strategic reason for not calling the blood spatter expert, and the arguments raised by the state to undermine the probative value of this evidence (suggesting that Doe would have had time to wash the blood off, and that the witness who spent time with him later that evening did not see him in bright light) provide no reason not to present this testimony.

Additionally, Doe argues that J.B. failed to investigate and challenge the reliability of one of the state's witnesses, P.F., a girlfriend-turned-informant who testified that she bumped into Doe the night of the murder, that he left her alone during the time the crime was committed, and that he returned with a bit of blood on his hand and carrying distinctive items stolen from the home in which L.R. was killed. P.F. testified that he told her that he had "just finished beating up a woman." Later, she taped a conversation with Doe, during which he made inculpatory statements.

There was good reason to doubt the reliability of P.F.'s testimony. Two women who knew her told D.S. that she had a reputation for lying. However, neither D.S. nor J.B. interviewed B.P., one of the two people P.F. said she had been walking with when she encountered Doe that evening. When contacted later by habeas counsel, B.P. contradicted P.F.'s story, stating convincingly that she knew she had not

---

[8] J.B. never asserted a strategic reason for not calling C.L.

been out with P.F. that night. P.F. had been in a bicycling accident shortly prior to the date of the crime, and a number of people stated in declarations that she had suffered from significant memory loss for months. P.F. essentially admitted in a declaration that, because she was still recovering from the accident, she could not have been with Doe on the night of the murder. It also appears that she was suffering cognitive deficits resulting from the combination of a medication and alcohol. Doe argues that in addition to impeaching P.F. based on her reputation for dishonesty and cognitive deficits, J.B. should have asked her about the extent to which the police appear to have helped her fill holes in her memory.

However, J.B. *did* impeach P.F. to a significant degree. He elicited testimony about the seriousness of her head injury and the fact that she was taking medication and drinking alcohol on the night of the murder. He also elicited testimony that she had previously made false statements. He demonstrated that the moon was not full, as she had stated, the night of the murder, and that items she claimed to have seen that night in the vacant house had been removed previously. Finally, he prompted her to admit that she had not initially remembered the date of her interaction with Doe, and that the police had supplied her with it. We agree with the district court that while J.B. could have done a much better job of impeaching P.F., his efforts in this respect were not constitutionally inadequate. The additional impeachment evidence would have been largely cumulative, albeit stronger, but the failures regarding impeachment of P.F. are of comparatively little consequence, as the most important portion of her testimony was the introduction of her recorded conversation with Doe that served to corroborate the circumstantial evidence of his guilt.

Lastly, Doe asserts that J.B. should have introduced evidence that K.H. was dealing drugs out of his home, that he had argued with L.R. shortly before her death and had previously assaulted someone, that neighbors reported domestic problems, and that L.R. had expressed to M.H. her fear that her wild life would end before her next birthday. The state is correct that evidence suggesting K.H.'s culpability would have been excluded under *People v. Hall*, 41 Cal. 3d 826, 833 (1986), because for third party evidence to come in, it must demonstrate more than "mere motive or opportunity." As for the evidence going more generally to the dangerous circumstances in which the victim lived, we do not believe it would have created significant doubt in the minds of the jurors.

J.B. certainly did not provide high-quality representation to Doe at the guilt phase of his trial. However, he had a strategic justification for not calling the child witnesses. While he offered no such justification for his failure to follow up with the alibi witness, call the blood spatter expert, or demonstrate the dangerous environment in which the victim lived, it appears that none of this evidence would have been particularly persuasive. Failing to impeach P.F., the prosecution's most important witness, would have been a very serious error, but J.B. did offer substantial impeachment evidence. Hence, we conclude that Doe has not shown prejudice.

Decisively, the prosecution's strongest evidence – which is not addressed by any of the claims Doe raises here[9] – was

---

[9] Doe also claims that J.B. was ineffective for his failure to help the jury correctly interpret his statements on this recording. However, J.B. did in fact suggest to the jury that Doe might have made such statements in an

the taped conversation between him and his girlfriend, P.F., during which, as the state argues, Doe made inculpatory statements. While Doe at one point denied involvement and never explicitly confessed, he made a number of very damning statements in regard to the murder. He warned: "They can't prove a motherfuckin' thing, not unless you open your motherfuckin' mouth." He added: "Baby what you fail to realize, how the motherfuckers they gonna prove I was there? . . . There ain't no motherfuckin' fingerprints, ain't no fuckin' where in there, and ain't no fuckin' body seen me go in there and leave out of there." In response to a request to tell her "what the fuck happened over there," he said: "Why should I, so you can go back and tell [the police?]" When she stated that she had seen blood on him that night, he replied, "Ain't on me no more." Because of the strength of this evidence, we conclude that even if J.B. had performed adequately, there is not a reasonable probability that the jury would have acquitted Doe of murder.

## C. *Batson*

Third, Doe claims that the prosecutor at his trial used peremptory strikes in a racially discriminatory manner, and that J.B. was ineffective for his failure to raise an objection. Four black veniremembers remained after excuses for hardship and death qualification; two were struck by the prosecutor, a third was removed for cause, and the remaining one was empaneled. Doe contends that J.B. was ineffective for failing to challenge these strikes under *Batson v. Kentucky*, 476 U.S. 79 (1986). In fact, J.B. did raise such a

---

effort to end the conversation. While the other "interpretive lens[es]" Doe proposes could possibly have been helpful at trial, J.B.'s performance in this respect was not unreasonable.

challenge, demanding reasons *before* the black jurors were struck, but the trial court ruled – correctly – that it was premature. For reasons passing understanding, J.B. never renewed his request *after* the black jurors were removed from the venire. This failure made it necessary for Doe to raise the issue of discriminatory jury selection through an ineffective assistance of counsel claim.

Doe is correct that this failure constituted deficient performance. Additionally, though, Doe has the burden to demonstrate prejudice by showing that there is a reasonable probability that the claim J.B. failed to raise at trial would have prevailed, either at trial or on appeal. *Strickland*, 466 U.S. at 694. He cannot do so.

In order to prevail on a *Batson* claim, Doe would have needed to make a prima facie showing that the prosecutor exercised his peremptory strikes on the basis of race. To show that he could have done so, he relies on the statistically disparate use of strikes, and on the fact that the prosecutor asked black – but not white – veniremembers whether their race might influence their judgment. While the prosecutor's disparate use of strikes and selective questioning is troubling, in a recent and similar case, *Carrera v. Ayers*, 699 F.3d 1104, 1110–11 (9th Cir. 2012) (en banc), *cert. denied*, 133 S. Ct. 2039 (2013), we concluded that under the standard that would have applied at Doe's trial and on direct appeal,[10] such a

---

[10] *Id.* at 1110. ("We must evaluate Carrera's ineffective assistance claim under the law the California Supreme Court would have applied on direct appeal in 1990. When Carrera's appeal was decided, the United States Supreme Court's decision in *Johnson* [*v. California*, 545 U.S. 162 (2005) (holding that the *People v. Wheeler*, 583 P.2d 748 (Cal. 1978) and *Batson* standards are different, and that the less demanding *Batson* standard controls)] was still fifteen years in the future. We therefore apply

statistical disparity combined with questions about racial bias posed only to veniremembers of a particular racial or ethnic group was insufficient to show a "strong likelihood" that the strikes were made "because of [the veniremembers'] group association," and therefore insufficient to demonstrate prejudice.[11] We are bound by that precedent, so we deny relief with respect to the claim that J.B. was ineffective for failing to properly make a *Batson* challenge.

### D. *Brady*

Fourth, Doe argues that the prosecutor improperly withheld impeachment evidence – namely, that the police working on his case had interceded on behalf of M.H. in a welfare fraud and perjury case. The extent of the intercession, if any, remains unclear; there is no evidence in the record of any deal, except for a notation in M.H.'s file by an unidentified person that she was "very important to [a] case." Whether or not this constituted a violation of *Brady v. Maryland*, 373 U.S. 83 (1963),[12] however, Doe cannot

*Wheeler*'s 'strong likelihood' standard, rather than *Batson*'s 'raise an inference' standard, in determining whether Carrera would have been able to establish a prima facie case . . . .").

[11] We stated in *Carrera,* 699 F.3d at 1111:

> It is true that the prosecutor asked Hispanic-surnamed venirepersons whether the fact that the defendant was "of Spanish descent" would affect their deliberations, and that he did not ask potential white jurors similar ethnicity-based questions. However, asking questions about potential bias is the purpose of voir dire.

[12] Certainly, failure to disclose an agreement to put in a good word for M.H. might have violated *Brady. Hovey*, 458 F.3d at 916–17.

establish prejudice. *See Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). M.H.'s testimony simply described items taken from the house during the murder-burglary, which the prosecution compared to the (nearly identical) list of items P.F. reported seeing in Doe's possession. Especially given that the jury already knew that M.H. had been charged with perjury, it is unlikely to have further discounted her testimony upon learning that she received some indefinite benefit for her cooperation. What's more, Doe's recorded statements, discussed previously, were strong enough evidence to support a conviction even if the jury had some doubt about M.H.'s credibility.

## E. Evidence of Prior Crimes

Fifth, Doe asserts that the jury received extraneous evidence of prior crimes he committed, and that this prejudiced him. Specifically, he complains that during an hour-long mid-trial examination of exhibits, but not during its eventual deliberations, the jury had access to unredacted transcripts of Doe's recorded conversation with P.F. containing references to a prior burglary and a prior assault. However, these references were extremely brief and buried in a transcript containing much more compelling evidence of Doe's guilt. Furthermore, the jurors were questioned about their review of the transcripts after the conclusion of the penalty phase, and none remembered reading anything about assaults or burglaries in the transcript. We agree with the district court that this evidence, even if the jury did see it, was harmless.

Doe also challenges the trial judge's decision to allow the prosecutor to impeach a character witness, D.P., Doe's girlfriend in California, by asking her whether she had heard

that he had been accused of rape in his home state and whether this affected her opinion of him. (It did not.) Impeachment of character witnesses with questions about prior bad acts of the defendant, even if unproven, is common practice. *See* Fed. R. Evid. 405(a). Thus, this claim fails.

## F. Cumulative Prejudice

Sixth, and finally, Doe claims that these guilt-phase errors were cumulatively prejudicial. Because Doe's guilt-phase claims do not call into question the veracity or admissibility of the most damning evidence of his guilt – his own recorded, inculpatory statements – we hold that, on the record before us, he cannot demonstrate prejudice with respect to his conviction.

## IV. Penalty-Phase Ineffective Assistance of Counsel

More important, for purposes of this opinion, Doe contends that his counsel was constitutionally ineffective for failing to investigate, and present at the penalty phase of his trial, certain mitigating evidence. That evidence relates to sexual abuse he suffered while previously incarcerated in a notorious prison in the South, as well as to mental illness, neglect and abuse he suffered during his childhood, and substance abuse. To prevail on this claim, Doe must show both that counsel was deficient and that he was prejudiced as a result. *Strickland*, 466 U.S. at 687–88.

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. Defense counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable

professional judgment." *Id.* at 690. To rebut this presumption, Doe must show that J.B. did not act "reasonabl[y] considering all the circumstances." *Id.* at 688.

"No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Id.* at 688–89. However, "[r]estatements of professional standards . . . can be useful as 'guides' to what reasonableness entails . . . to the extent they describe the professional norms prevailing when the representation took place." *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009). At the time of Doe's trial in 1987, the prevailing professional norms, as outlined by the ABA Standards, required that a lawyer "conduct a prompt investigation of the circumstances of the case and [] explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction," and "called for [trial] counsel to cover several broad categories of mitigating evidence." *Id.* at 7, 11 (citation omitted). The commentary to the standards made clear that "information concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant . . . ." *Id.* at 7–8.

"[D]eath is different[.]" *Ring v. Arizona*, 536 U.S. 584, 587 (2002). So too are the lengths to which defense counsel must go in investigating a capital case. "The imperative to cast a wide net for all relevant mitigating evidence is heightened at a capital sentencing hearing because the Constitution prohibits imposition of the death penalty without adequate consideration of factors which might evoke mercy." *Frierson*, 463 F.3d at 989 (citation and internal quotation marks omitted). "Although counsel's duty to seek out

evidence of mitigation is not limitless, the Supreme Court has recognized that the failure to pursue avenues of readily available information – such as school records, juvenile court and probation reports, and hospital records – may constitute deficient performance." *Id.* (citing *Rompilla v. Beard*, 545 U.S. 374, 381–83 (2005)).

Although defense counsel may choose to ignore manifestly unfruitful lines of inquiry, a lawyer has not fulfilled his duties to his client if he ceases investigating because his client has not been forthcoming about his background or because counsel has acquired *some* relevant information. Rather, if what counsel knows or should know suggests that further investigation might yield more mitigating evidence, counsel must conduct that investigation. *See Douglas v. Woodford*, 316 F.3d 1079, 1088–89 (9th Cir. 2003). "The presence of certain elements in a capital defendant's background, such as a family history of alcoholism, abuse, and emotional problems, triggers a duty to conduct further inquiry before choosing to cease investigating." *Earp v. Ornoski*, 431 F.3d 1158, 1175–76 (9th Cir. 2005).

### A.  Deficient Performance

We agree with the district court that counsel was ineffective in failing to investigate and present mitigating evidence.

### 1.  Review of Investigation

As a preliminary matter, J.B. was deficient in his acknowledged failure to consider even the evidence D.S.'s limited investigation had turned up: he did not "listen[] to any

tapes of [D.S.]'s interviews, nor did [he] read transcripts of any taped interviews." J.B. did read a few summary investigation reports produced by D.S., but these included virtually no material from the interviews conducted in Doe's home state. Even if D.S. had conducted an adequate investigation – which he did not – J.B. would not have learned what D.S. had discovered.

Because J.B. failed to review and follow up on the information presented to him by his investigator, he missed clear indications, for example, that his client was repeatedly raped in prison. An ex-girlfriend, I.R., told D.S. that Doe was "fresh meat" upon his arrival in prison at the age of 17, and that people in the community were well aware that fellow prisoners "got some" from him.[13] J.B. also knew that Doe's mother, C.G., had sought psychiatric help for her son after his release from prison. J.B.'s file contained a copy of a lengthy article from the inmate newspaper at the notorious Southern prison where Doe was incarcerated, which described in graphic detail the frequency and effects of prolonged sexual abuse.

### 2. Prison Records

J.B. had a bit of Doe's prison file – nine pages of criminal record, discharge papers, a rap sheet, and fingerprints. D.S.

---

[13] The state suggests an inconsistency between the claim that many people knew about Doe's victimization, and the fact that most of those interviewed by D.S. did not talk about it. (One other interview subject assumed that he was sexually abused and mentioned rumors to that effect.) It is not very difficult to imagine, however, that members of a poor black community in the South might not volunteer, unless asked directly, embarrassing information about a family member and friend to an interloper from California.

told J.B. that to get the complete file, which would shed additional light on Doe's time in prison, J.B., as counsel, would need to request it. J.B., however, did not follow up on this most straightforward of leads, handed to him by his investigator: he did not request the records, and "do[es] not remember making any efforts to learn about [Doe]'s experience [in prison]."

In addition, neither J.B. nor D.S. asked Doe whether he suffered abuse while incarcerated. Although Doe told them about being in prison, J.B. was "unaware of any allegation that [Doe] had been [redacted in original] abused [in prison],"[14] and "did not specifically inquire" about any abuse."I believe I should have known it," J.B. said.

J.B.'s failure to send off for Doe's prison records – easy to obtain and very valuable – constituted deficient performance. *See Correll v. Ryan*, 539 F.3d 938, 945 (9th Cir. 2008) (finding deficient performance based in part on defense counsel's failure to obtain correctional records he knew existed).

### 3. Interviews with Doe

J.B. had only one interview with Doe himself, during which he barely asked any questions about his upbringing. J.B. admitted that his interview with Doe was perfunctory: "I

---

[14] D.S., on the other hand, admits that he "learned that [Doe] had been subjected to some sort of physical and sexual abuse while he was incarcerated . . . ." Somehow, this vital piece of information was never passed along to J.B. nor pursued further by D.S.; "no further investigation was made into issues relating to [Doe]'s incarceration . . . , including any issue relating to sexual victimization."

do not recall whether I discussed with [Doe] the abuse from his Uncle [J.C.], but if I did, it was on a superficial level." He also acknowledged that this failure affected his penalty-phase presentation, because "the testimony elicited at trial reflected the extent of the abuse of which I was aware."

D.S. also spent a few sessions interviewing Doe. While Doe did speak positively about some aspects of his childhood, and said that "he would call everyone [in his family] basically sane," Doe did mention – without disclosing its full extent – the physical abuse he suffered at the hands of his uncle. D.S. himself expressed the suspicion that Doe "avoid[ed]" or "ignor[ed]" his problems. He expressly informed J.B. that his interview of Doe was merely a preliminary inquiry into Doe's personal and family history, noting that this "information was provided by [Doe] himself and is [in] no way meant to be a complete list of information available . . . ."

As a psychologist later retained by habeas counsel explained, based on professional experience, there are often reasons why a person who has been chronically abused and neglected might well decline to disclose the details of difficult and embarrassing personal history. That Doe did not volunteer more about the trauma he experienced during his childhood and in prison did not absolve J.B. of the need to conduct an adequate mitigation investigation, especially since Doe did identify (and D.S. recognized), if not in elaborate detail, a number of avenues for further investigation that would have proved fruitful.

The district court was correct in concluding that the deficiencies it found in J.B.'s penalty-phase performance were not excused by the alleged failure of Doe (and his family) to be completely forthcoming. "[Doe] never put any

limits on [the] penalty phase investigation," J.B. acknowledged. Nor did he make false statements to J.B. or D.S. or obstruct their investigation. Doe simply did what most capital defendants – and most people – do, and did not volunteer deeply painful, shameful information when not pressed for details. Trial counsel has an affirmative duty not to simply accept the facts as they might be presented at first blush, but rather to "unearth[] for consideration" at the sentencing phase "all relevant mitigation information." *Wallace v. Stewart*, 184 F.3d 1112, 1117 (9th Cir. 1999) (quoting *Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999)); *see also Daniels*, 428 F.3d at 1209 (holding that counsel's failure to investigate was not excused even by his client's refusal to communicate).

*Anderson v. Calderon*, 232 F.3d 1053, 1094 (9th Cir. 2000), cited by the state, is not to the contrary. There, the defendant "did not disclose information relating to" the issues that later became central to habeas counsel's mitigation presentation: evidence of the physical and emotional abuse the defendant suffered during childhood. *Id.* Thus, counsel had no clue as to the existence of these occurrences. In contrast, Doe and his family members and friends did disclose *some* evidence relating to childhood abuse and neglect, mental health problems, substance abuse, and even victimization in prison – *all* of the issues later drawn out by habeas counsel. Although no one delivered to J.B. a fully developed mitigation presentation, that does not excuse his failure to pursue the leads he did receive.[15] Nor does *Babbitt*

---

[15] Additionally, the *Anderson* court merged the deficient performance and prejudice analyses, denying the failure to investigate claim largely on the basis that presentation of the undiscovered mitigating evidence would have undercut a very intentional (and to the court, persuasive) defense

*v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998), help the state. There, we noted that "[o]ther courts have held that 'counsel is not deficient for failing to find mitigating evidence if, after a reasonable investigation, nothing has put the counsel on notice of the existence of that evidence.'" *Id.* (quoting *Matthews v. Evatt*, 105 F.3d 907, 920 (4th Cir. 1997)).

By contrast, J.B. failed to conduct a reasonable investigation despite being on notice.

> [A]lthough counsel is not required "to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing[,]" they are in no position to decide, as a tactical matter, not to present mitigating evidence or not to investigate further just because they have *some* information about their client's background. Moreover, . . . the presence of certain elements in a capital defendant's background, such as a family history of alcoholism, abuse, and emotional problems, triggers a duty to conduct further inquiry before choosing to cease investigating.

---

strategy, which included the argument that his "venerable mother [was] wronged and imprisoned because of a crooked judge . . . [and that] this terribly unjust episode explains and mitigated [his] crooked youthful turn in the road." *Id.* It is far from clear that even Anderson's apparent failure to reveal any useful information to his defense team would, on its own, have supported the court's conclusion.

*Earp*, 431 F.3d at 1175 (citing *Wiggins v. Smith*, 539 U.S. 510, 525, 527, 533 (2003)).

### 4. Interviews with Others

The interviews conducted by D.S. (and the few conversations J.B. himself had) with relatives and friends of Doe's were unquestionably deficient.

J.B. spoke at any length with only two people: Doe's mother and his aunt, L.P. Had J.B. asked them more than admittedly cursory questions, he would have learned what the experts retained by habeas counsel did.[16] Had he gone further

---

[16] By and large, the evidence later discovered through more comprehensive interviews was consistent with – and far more detailed than – the history provided initially. The one discrepancy relates to the years during which Doe was under the care of his mother, versus that of his grandmother and uncle. Doe's mother suggested that he was in her custody for more of his early childhood than was actually the case, though D.S. was also told that Doe had been removed from his mother's care and raised by his grandmother and uncle. This disparity should have prompted further inquiry, but D.S. never asked Doe's mother for clarification. "[If he had done so,] counsel would have become skeptical of the impression given by [some of Doe's] family members and would unquestionably have gone further to build a mitigation case. Further effort would presumably have unearthed much of the material postconviction counsel found [with respect to childhood abuse and neglect]." *Rompilla*, 545 U.S. at 391. When she was asked the question directly, during post-conviction proceedings, Doe's mother testified that her children lived primarily with their grandmother. Doe's grandmother and aunt confirmed that his mother abandoned Doe at a young age.

It is not surprising that experts with mitigation training, charged with conducting a mitigation investigation, were better able to elicit useful information about deeply personal, shameful trauma and dysfunction than were a lawyer and investigator who did not follow up on obvious, critical

than speaking "with them generally about the penalty phase," he would have discovered powerful mitigating evidence. Instead, J.B. abandoned further investigation after "having acquired only rudimentary knowledge of [Doe's] history from a narrow set of sources[,]" and despite what he "actually discovered" in the course of his limited investigation. *Wiggins v. Smith*, 539 U.S. 510, 524–25 (2003); *see also Boyde v. Brown*, 404 F.3d 1159, 1177 (9th Cir. 2005); *Douglas*, 316 F.3d at 1082, 1088.

J.B. did travel to Doe's home state, but when asked if he visited Doe's house, J.B. said: "I remember going to the neighborhood and going to the bar but not – I drove by the [family-owned] bar. . . . But I wasn't comfortable being me just getting out and walking in there by myself so I decided not to go in." He spoke on the phone with Doe's mother (and possibly others) while he was there, but did not conduct any in-person interviews. At no point during his representation of Doe, J.B. reported, did he speak with anyone other than those he called to testify at the penalty phase.

When D.S. went to Doe's home state, he, at least, got out of his car. However, he repeatedly failed to ask obvious questions, including follow-up questions when interviewees revealed potentially significant information. He did not ask relatives and friends who had known Doe during his childhood about his upbringing or behavioral signs of mental illness. When the mother of one of Doe's girlfriends (both mother and daughter were named V.M.) said she felt he was "like a second son," and that he called to speak with her after

leads, and a psychological expert asked only to investigate guilt-phase mental-state defenses who was deprived of the background material she required (and requested) to do even that job adequately.

he was released from prison about putting his sentence behind him, D.S. did not follow up to ask whether Doe had ever mentioned that he suffered abuse while incarcerated. When another interviewee, M.W., who had known Doe as he was growing up, described him as a "loner," D.S. did not ask any follow-up questions about his mental health. Although Doe's stepfather, B.G., had also served time in the same prison, D.S. did not ask him about abuse Doe might have suffered in prison. When a friend, J.A., reported that Doe told him over the phone that the prison was a "bad place," D.S. did not ask whether Doe had said anything further. Other interviewees also mentioned that Doe was different after his release, or that they had spoken to him while he was incarcerated, but D.S. never asked them if they knew about any trauma Doe might have suffered in prison. As J.B. acknowledged, the important questions about Doe's life were simply never asked.

D.S. appears to have met only once with each interviewee, and many of the meetings were arranged by Doe's mother at her home. Obviously, interviewees are less likely to be forthcoming about sensitive topics in the presence of family members and friends. *See Correll v. Ryan*, 539 F.3d 938, 945 (9th Cir. 2008) (noting that "counsel testified that he met only once with Correll's father, sister, and brother, 'around the kitchen table at the same time,'" in concluding that the interviews he conducted were "worthless").

In the taped interviews, D.S. did not ask whether interviewees knew of any others who might have more or better information about Doe's family history. Although D.S. said that he would normally conduct interviews in a way that would lead to identification of potential witnesses, he testified only that it was "possible" this was done in this case. Other witnesses, such as those whom habeas counsel was able to

find, were "easily within [counsel's] reach," and would have been discovered by trial counsel, "[h]ad [he] only looked." *Wallace*, 184 F.3d at 1116. Some of these witnesses were able to speak to Doe's experiences in prison and their psychological effects on him.

### 5. Psychological Experts

J.B. did retain a psychologist, Dr. M.R., to interview Doe. She had the professional expertise necessary to discover and present the compelling mitigating testimony regarding Doe's mental health that went unheard at trial, but she was limited by the terms of her engagement. J.B. hired her, she reported, only to determine whether any mental state defenses based on "obvious signs of mental impairment" could be mounted at the guilt phase of the trial. Dr. M.R. reported that she "was not asked to do more," and that she "was not asked to provide expert assistance in preparing or presenting a mitigation case at the penalty trial."[17]

In addition to having a limited scope, the investigation that Dr. M.R. conducted was abbreviated. She was paid only for twelve and a half hours of her time and met with Doe only once, for an hour-long session largely devoted to filling out a questionnaire and discussing his criminal record. In her

---

[17] The state contends that Dr. M.R. was in fact retained for the purpose of developing a mitigation case at the penalty phase. When asked whether he actually told her to conduct a penalty-phase investigation, J.B. testified: "I don't recall exactly what I told her. But I did tell her that it was a capital case and that I was looking into all issues with regard to [Doe]." J.B. may have told Dr. M.R. that *he* was looking into "all issues," but he did not tell *her* to look into "all issues." No one else was looking into Doe's mental health, either; J.B. did not recall having investigated, or having asked D.S. to investigate, whether Doe had ever received psychological treatment.

report to J.B., Dr. M.R. described her work as a "relatively
brief evaluation," and described her conclusions as "initial
clinical impressions." It appears that J.B. never spoke with
Dr. M.R. after he initially hired her. The only background
materials he provided her were police reports.[18] When she left
a message saying that she had "no documents on
background," he did not bother to return her call.[19]

---

[18] Dr. M.R. noted this deficiency in her report, stating: "If . . . there is
further information that the defense counsel wishes to bring to my
attention in order to evaluate [Doe] further, I shall be happy to do so."
Contrary to the state's contention, Dr. M.R. made clear that the life history
she considered was "provided" by Doe himself during their interview, not
by D.S.

[19] Providing psychological experts with the background material
necessary for them to competently and correctly evaluate defendants is
critical, and when such information is requested by an expert, as here, the
failure to provide it constitutes deficient performance. When no
background information is made available, experts may conclude that
further investigation will not be fruitful, just as Dr. M.R. did here. *See
Rompilla*, 545 U.S. at 392 ("The jury never heard any of this and neither
did the mental health experts who examined [the defendant] before trial.
While they found 'nothing helpful to [his] case,' their postconviction
counterparts, alerted by information from school, medical, and prison
records that trial counsel never saw, found plenty of 'red flags' pointing
up a need to test further." (citations omitted)); *Silva v. Woodford*, 279 F.3d
825, 842–43 (9th Cir. 2002) ("In *Bloom v. Calderon,* 132 F.3d 1267 (9th
Cir. 1997), a case with several important parallels to this one, we also
found that a trial attorney's failure to obtain and prepare a psychiatric
witness was constitutionally deficient. . . . [H]is trial counsel . . . failed to
provide him with necessary and available data which would have assisted
the expert in his subsequent evaluation and trial testimony-including an
outline of the theory of defense. As a result, the psychiatrist, who
constituted the sole defense expert witness, produced a severely damaging
psychiatric report which the prosecution used effectively in cross-
examination and in closing argument. We found that such performance
was constitutionally deficient, in that counsel had failed to furnish the
expert with easily available information such as a social history, a prior

This left J.B. effectively without the assistance of any expert at all at the penalty phase. J.B.'s failure to retain a psychological expert for the penalty phase was objectively unreasonable, given that he had sufficient notice of Doe's mental health problems. He knew – or would have known, if he had reviewed the interviews that D.S. conducted – that Doe's mother brought him to a hospital for psychiatric help. D.S. stated in his assessment of Doe, which J.B. does appear to have read, that "he will not acknowledge that he has a psychiatric problem." Doe's mental illness was recognized by J.B.'s investigator, who was not a mental health expert. However, even this recognition was not enough to motivate J.B. to order a mitigation-related psychiatric examination of his client.

The state's assertion that Dr. M.R. addressed the issue of mitigating evidence in her report is incorrect. To the extent she commented on evidence relevant to the penalty-phase presentation, it was entirely in passing. "If in the course of performing [her limited-scope guilt-phase] evaluation [she] had seen] issues that [she] thought would be useful for a penalty phase presentation, [she] would have flagged the issues for [J.B.]." Dr. M.R. was definitely not, however, "providing expert assistance in analyzing and developing a full-blown mitigation case." Indeed, how could she have been? She "received no life history information regarding [Doe] from the defense." Instead, she simply explained that

psychiatric report, and jail medical records. Although we acknowledged that under *Hendricks v. Calderon,* 70 F.3d 1032 (9th Cir. 1995), 'counsel does not have a duty to acquire sufficient background material on which an expert can base reliable psychiatric conclusions independent of any request for information from an expert,' we concluded that the record did not support the district court's finding that the expert had not requested such information." (citations and internal quotation marks omitted)).

"[she] had not seen any evidence that [she] believed to be mitigating *during the course of evaluating whether* [*Doe*] *had a guilt phase mental defense*."[20]

Hiring an expert to evaluate possible guilt-phase mental-state defenses does not discharge defense counsel's duty to prepare for the penalty phase. *Hendricks v. Calderon*, 70 F.3d 1032 (9th Cir. 1995), is directly on point. In *Frierson*, we explained:

> Because the evidence presented at each phase of a trial serves a markedly different purpose, we analyze the reasonableness of counsel's efforts to prepare for trial and sentencing differently. As we explained in *Wallace v. Stewart*: "*Hendricks* alludes to why the lawyer's burden might differ at the guilt phase from that at the penalty phase: Mental state is relevant at the guilt phase for issues such as competence to stand trial and legal insanity – technical questions where a defendant must show a specific and very substantial level of mental impairment. Most defendants don't have problems this severe, and counsel can't be expected to know that further investigation is necessary to develop these issues. By contrast, all potentially mitigating evidence is relevant at the sentencing phase of a death case, so a troubled childhood and mental problems may help even if they don't rise to a specific, technically-defined level."

---

[20] Emphasis added.

Thus in *Hendricks*, we held that it was reasonable for counsel to rely on his experts' findings that no diminished capacity defense was available at the guilt phase, and to terminate his perfunctory investigation of his client's known mental impairments.

Our determination in *Hendricks* that counsel's investigatory work was reasonable, however, did not extend into the penalty phase. Because a sentencing jury is given "broad latitude to consider amorphous human factors, in effect, to weigh the worth of one's life against his culpability," we have recognized that the presentation of relevant mitigation evidence is of vital importance to the jury's penalty determination. Accordingly, we concluded that "counsel's failure to investigate his client's mental condition as a mitigating factor in a penalty phase hearing, without a supporting strategic reason, constitute[d] deficient performance." We therefore held that because evidence of Hendrick's "nightmarish upbringing" and "mental problems" could have altered the jury's decision to impose a death verdict, counsel was constitutionally ineffective.

463 F.3d at 993 (citations omitted). *Compare Summerlin v. Schriro*, 427 F.3d 623, 631 (9th Cir. 2005) (counsel's performance was deficient for relying exclusively on information developed at the defendant's pre-trial competency examination), *with Stokley v. Ryan*, 659 F.3d 802, 812–15 (9th Cir. 2011) (counsel's performance was not

deficient, in choosing a neurological exam over a neuropsychological exam, when either was recommended, because counsel did pursue mental health evaluations pertinent to sentencing, as recommended by mental health experts, provided the documents the experts suggested, and presented their testimony).

Based on this evidence, the district court concluded that defense counsel "did not fulfill his responsibility to [Doe] on the issue of investigating and presenting mental health testimony simply by retaining Dr. [M.R.], given the brief time she spent with him." Especially given that J.B. failed both to instruct Dr. M.R. specifically to investigate penalty-phase mitigation and to provide her with any of the documents necessary to complete that task (which she requested), we firmly agree.

### 6.  Substance Abuse

D.S.'s investigation did not reveal the extent of Doe's substance abuse, but it did reveal enough to warrant expert follow-up. Doe acknowledged that he drank alcohol excessively, that he became aggressive when he was drunk, and that he had used both marijuana and cocaine. Other interviewees noted that he had problems with alcohol and that the robbery he committed was alcohol-related.

Most important, D.S. concluded that although "[Doe] feels that he has no drinking problem, . . . [i]t appears to this investigator that alcohol is a direct cause for [Doe]'s violence as he described his past life to me." He went on to say that "[Doe] does not necessarily like to admit that he may have certain problems in particular areas . . . [such as] his inability to control his drinking and drug abuse . . . ." Despite his

investigator's clearly expressed disbelief in Doe's representations about substance abuse – in a report he does appear to have read – J.B. did not follow up, and thus did not discover the fact that Doe consumed substances in a failed attempt to lessen the pain of the trauma he had suffered.

### 7. Penalty-Phase Witnesses

In addition, Doe claims, J.B. did nothing to prepare his penalty-phase witnesses. J.B. does not dispute this: "I did not prepare any of the penalty phase witnesses for their testimony. I did not tell them what specific questions I was going to ask them nor did we discuss the responses I expected from them."[21] Although this failure, on its own, might have been insufficient to establish deficient performance, it serves here to reinforce other evidence of J.B.'s woefully incompetent mitigation investigation and presentation.[22]

The witnesses who did end up testifying were family and friends attending the trial. Some of them were not told that they would be testifying until they arrived.[23]

---

[21] When asked how he chose which witnesses to call, he could not recall.

[22] Notably, these witnesses could have spoken to much of the mitigating evidence later presented during Doe's habeas hearing, except for the details of his prison experience (but including the psychological ramifications of it).

[23] J.B. never informed two witnesses that he would be calling them as witnesses. He spoke to Doe's aunt before she testified, but did not tell her what he planned to ask her, and merely instructed her to "plead for [Doe]'s life." J.B. spoke with Doe's ex-girlfriend, D.P., prior to her testimony, but just briefly, "to get to know her," and not about what he would ask or what she would say.

J.B. did little better with the two penalty-phase witnesses he "spent a lot of time with[,]"[24] Doe's mother and aunt. He acknowledged in his declaration that his failure to prepare them to testify was related to his failure to discover the powerful mitigating evidence about which they could have spoken. He said: "[M]y relationship with them was quite superficial, and I got very little useful or accurate information from them about [Doe]'s life before his arrest for this offense." J.B. also acknowledged that he "spoke with them only generally about the penalty phase [and] did not go over with them the particular questions they would be asked." He explained that Doe's "mother and aunt seemed like such nice, sweet ladies that I never got beyond consoling them about [Doe]'s plight so as to get to really understand his life."

The state's argument that J.B.'s failure to prepare penalty-phase witnesses was an acceptable trial strategy is erroneous. Even if it were an intentional decision on his part – which is both doubtful and disturbing – spur-of-the-moment mitigation presentations form no part of constitutionally adequate representation. Witness preparation is a critical function of counsel. *See Hamilton v. Ayers*, 583 F.3d 1100, 1121 (9th Cir. 2009) ("[T]he failure to prepare a witness adequately can render a penalty phase presentation deficient. This is especially true when the insufficiently prepared witness[es] [are] the only penalty phase witness[es] called to testif[y]." (emphasis and citations omitted)); *Douglas*, 316 F.3d at 1088–89 (failure to prepare defense mitigation witnesses led both to inadequate development of evidence and also to less-than-compelling testimony). A lawyer needs to know the

---

[24] Actually, he met in person with Doe's mother only two or three times, each time for less than an hour. It is not clear how much time they spent on the phone.

nature of the testimony he will elicit, and a witness needs to understand the proceeding in which he is participating. Our case law, and an elementary understanding of the function of a trial lawyer in our adversary system, make plain that although there is no requirement of rehearsal,[25] not preparing penalty-phase witnesses *at all* is not a legitimate defense method in a capital trial.

## 8. Conclusion

The investigation here was facially inadequate. J.B. fell far short of his "sacrosanct duty to conduct a full and complete mitigation investigation." *Earp*, 431 F.3d at 1175. This conclusion is only strengthened by the fact that the limited investigation J.B. and D.S. did conduct put them on notice that further investigation was warranted. Unfortunately for Doe, they failed to perform it. We have repeatedly held, as has the Supreme Court, that this constitutes deficient performance. *See Lambright v. Schriro*, 490 F.3d 1103, 1117 (9th Cir. 2007) (reaffirming the principle that "when 'tantalizing indications in the record' suggest that certain mitigating evidence may be available, those leads *must* be pursued" (emphasis added) (quoting *Stankewitz v. Woodford*, 365 F.3d 706, 719–20 (9th Cir. 2004))); *see also Wiggins*, 539 U.S. at 525 ("The scope of their investigation was also unreasonable in light of what counsel actually discovered in the [files he did obtain]. . . . [A]ny reasonably competent

---

[25] J.B. stated that he has a practice of not rehearsing witnesses. That is all well and good. However, there is a big difference between training witnesses to regurgitate a prepared statement and discussing with witnesses the process and purpose of the hearing and the scope and substance of their prospective testimony. The former might indeed undermine their credibility on the stand, whereas the latter is constitutionally required.

attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses . . . . Had counsel investigated further, they might well have discovered the sexual abuse later revealed during state postconviction proceedings."); *Stankewitz v. Wong*, 698 F.3d 1163, 1171 (9th Cir. 2012) ("The state's argument that [defense counsel's] mere possession of [files containing leads to mitigating evidence] demonstrates that [he] conducted a reasonable investigation defies logic – if anything, that [he] had this evidence at his fingertips but did not investigate or present it is further proof of his deficiency.").

J.B. said: "I did not adequately prepare for a penalty phase in this case because of a combination of inexperience and overconfidence. . . . I did not ask the right questions of [Doe], his family, myself, or my investigator to obtain an adequate understanding of my client and his case." We cannot help but agree.

## B.  Strategic Judgment

There is a "wide range of reasonable professional assistance[,]" *Strickland*, 466 U.S. at 689, but J.B.'s performance was not within its outer bounds. Unlike most trial lawyers called to testify before a habeas court, J.B. never attempted to justify his actions as based in strategy; he admitted that he would have presented the extensive mitigating evidence habeas counsel discovered, had he found it himself. J.B. acknowledged that he did not make a strategic decision not to put on the sort of mitigating evidence later adduced; he simply didn't know about it. "Looking back on

the penalty phase of [Doe]'s trial, it's hard for me to say what my strategy was," he said.[26]

*Strickland* tells us that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 690–91. In conducting this analysis, we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[27] *Id.* at 689.

Here, J.B.'s "failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment." *Wiggins*, 539 U.S. at 526. "[D]efense counsel failed to make a

---

[26] J.B. stated that by putting on a few witnesses who knew, loved, and found value in Doe, thereby humanizing him, he "did not intend to exclude or foreclose the presentation of other types of mitigating evidence." Surely a penalty-phase presentation is not insulated from review merely because it is not entirely devoid of value, due to a few questions to a few witnesses that foreseeably elicited snippets of mitigation testimony. Notably, the evidence Doe argues that J.B. should have discovered and introduced was in no way inconsistent with the paltry evidence already presented.

[27] *Cullen v. Pinholster*, 131 S. Ct 1388 (2011), altered rather than clarified the analysis we apply in evaluating deficient performance of counsel going forward. This is because AEDPA requires, and *Pinholster* applies, not only *Strickland*'s presumption of attorney competence but also an additional layer of deference. As Chief Judge Kozinski put it, "*Strickland*'s presumption of competence *and* AEDPA deference *each* require us to presume that the lawyers did the smart thing, not the dumb one." *Pinholster v. Ayers*, 590 F.3d 651, 702 (9th Cir. 2009) (en banc) (Kozinski, C.J., dissenting) (emphasis added).

reasonable investigation into potential mitigating evidence. Therefore, his decision not to put on a mitigation case cannot be considered to be the product of a strategic choice. An uninformed strategy is not a reasoned strategy. It is, in fact, no strategy at all." *Correll*, 539 F.3d at 949.

The presumption that defense counsel's conduct falls within the wide range of reasonable professional assistance is inapposite, or at least firmly rebutted, when, as here, we know for sure that defense counsel had no strategy, because he has unequivocally said as much. Representing a capital defendant without a strategy is *per se* unreasonable, and necessarily constitutes deficient performance.

Generally, we credit the statements of defense counsel as to whether their decisions at trial were – or were not – based on strategic judgments.[28] In *Heishman v. Ayers*, 621 F.3d 1030, 1040 (9th Cir. 2010), we made clear that the trial strategy presumption does not apply when it "would contradict [defense counsel's] testimony rather than filling a gap in memory, contravening the Supreme Court's admonition against adopting 'a *post hoc* rationalization of counsel's conduct' instead of relying on an 'accurate description of their deliberations' [when one exists]." *Id.* (quoting *Wiggins*, 539 U.S. at 526–27). *See also Williams v. Taylor*, 529 U.S. 362, 373 (2000) (crediting "trial counsel's testimony before the state habeas court [that] counsel did not fail to seek [the defendant's] juvenile and social services records because he thought they would be counterproductive . . . [and his] acknowledg[ment] in the course of the hearings

---

[28] We do not foreclose the possibility that a court could find defense counsel not credible. However, there is no reason to conclude that J.B. was not telling the truth when he acknowledged his deficient performance.

that information about [the defendant's] childhood would have been important in mitigation").[29]

In any event, it is self-evident that J.B.'s failure to conduct further mitigation investigation was objectively unreasonable. "This is [] a case in which the defendant's attorneys failed to act while potentially powerful[30] mitigating evidence stared them in the face, or would have been apparent from documents any reasonable attorney would have obtained." *Bobby*, 558 U.S. 11 (citing *Wiggins*, 539 U.S. at 525; *Rompilla*, 545 U.S. at 389–93). D.S. suggested that J.B. obtain Doe's prison file, which contained readily apparent

---

[29] Justice Scalia, dissenting in *Wiggins*, made clear that explicit statements by defense counsel should be credited. *See* 539 U.S. at 557 (Scalia, J., dissenting) (decrying the fact that the majority "disbelieves the sworn testimony of a member of the bar"); *see also id.* at 538 (emphasizing that although "trial counsel testified under oath" that he conducted an investigation adequate to consider and reject the presentation of the mitigating evidence at issue, the majority concluded otherwise). He instructed that in the course of a prejudice analysis, we should credit trial counsel's statements about whether undiscovered evidence would have been introduced at trial. *See id.* at 553–54 ("It is irrelevant whether a hypothetical 'reasonable attorney' might have introduced evidence of alleged sexual abuse; [defense counsel] would *not* have done so, and therefore [the defendant] was not prejudiced by their allegedly inadequate investigation."). If we should trust the sworn statements of lawyers who claim to have performed adequately, we should certainly trust the sworn statements of lawyers who say they did not, against the interests of both their egos and their bar licenses.

[30] Our conclusion is strengthened by the fact that the unpresented mitigating evidence was so strong. *Stankewitz*, 698 F.3d at 1172–73 ("It is simply untenable that [his] decision to forego powerful mitigating evidence and instead put on his paltry penalty phase presentation was made in the exercise of reasonable professional judgment." (citation and internal quotation marks omitted)).

and powerful mitigating evidence. He failed to do so. D.S. noted that Doe was beaten as a child, and reported to J.B. his belief that Doe suffered more from mental health problems and substance abuse than he was willing to admit. Yet, no follow-up investigation to explore these issues was ever done. J.B. did not retain an expert to conduct a penalty-phase investigation, and when the psychologist he hired to consider mental state defenses at the guilt phase, Dr. M.R., called him to ask for records that would have allowed her to uncover the available mitigating evidence, he didn't even bother to return her call. This slipshod work cannot be "immunized from Sixth Amendment challenges simply by attaching to it the label of 'trial strategy.'" *Silva v. Woodford*, 279 F.3d 825, 846 (9th Cir. 2002).

In short, the evidence that J.B.'s performance at the penalty phase fell well below the constitutional minimum is overwhelming.

## V.  Prejudice

Although the district court found that J.B. had performed incompetently, it concluded that his deficient performance had not prejudiced Doe. That conclusion is erroneous.

To establish prejudice, Doe must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "That requires a 'substantial,' not just a 'conceivable,' likelihood of a different result." *Pinholster*, 131 S. Ct. at 1403 (quoting *Harrington v. Richter*, 131 S. Ct. 770, 792 (2011)). "[T]he question is whether there is a

reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. We therefore "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534.[31] Because death sentences in California must be imposed by a unanimous jury, we must find prejudice if there is a "reasonable probability that at least one juror would have" voted for life. *Id.* at 537; Cal. Penal Code § 190.4(b). We hold that there is a substantial probability that there would have been a different result at the penalty phase had counsel's performance during that phase of the trial not been ineffective.

## A.  Aggravating Evidence at Trial

The aggravating evidence the jury considered was, for a capital case, fairly minimal. Instead of any additional evidence about the murder for which Doe had just been convicted, beyond what was presented during the guilt phase of the trial, a stipulation was read to the jury that said in its entirety that a doctor, if called to testify, would state that "the victim in this case [L.R.] at the time of her death had a mild hemiparesis of the brain as a result of congenital cerebral palsy which entailed a varying but never totally disabling of her impairment in motor coordination and muscular development on her left side only."

---

[31] As above, we conduct this analysis without affording the extra deference to state court decisions required by *Pinholster*. There, the Supreme Court explained that pre-AEDPA case law offered no guidance as to post-AEDPA assessments of prejudice, because AEDPA requires doubly deferential review. For the same reason, post-AEDPA cases offer us little guidance here. We apply only the deference required by *Strickland*, and no second layer of deference.

The remainder of the aggravating evidence consisted solely of testimony about two incidents:

First, the prosecution called one of two women who were walking together in a park in Doe's home state when Doe robbed them at gunpoint. The jury learned that Doe, then a juvenile, had grabbed the woman's arm, pointed a gun at her, and demanded both of their purses. He fled immediately after acquiring them, leaving the women uninjured. A certified copy of Doe's conviction, showing that he had served five years in prison for this crime, was also introduced.

Second, the jury heard testimony about another incident, in which Doe was arrested on suspicion of residential burglary. (No conviction resulted.) Doe – who was homeless at the time – broke into an apartment after its residents left for work and got into bed. When he was found there, by a police officer, he was under the covers, wearing a sweatshirt and sweatpants but no socks or shoes. He initially gave a false last name and said that he had spent the previous night with his girlfriend, who, he said, lived in the apartment. After he was arrested, Doe was allowed to retrieve some of his clothing, which he had hung in the closet. At the police station, Doe admitted that he had entered through the window, but said that he had touched nothing and only wanted to sleep. In fact, it appeared that he had riffled through the kitchen, and moved the TV and VCR away from the wall (a screwdriver was found nearby). A long knife was found on the floor of the bathroom;[32] he had neglected to flush the toilet.

---

[32] The two police officers called to testify also mentioned that when they arrived at the apartment, they encountered a man – not Doe – holding a crowbar and guarding the door. Apparently (and confusingly), they seem

This penalty-phase aggravating evidence is a far cry from that which the Supreme Court deemed "extensive" in *Pinholster*, 131 S. Ct. at 1408. There, the state presented evidence that the defendant had "threatened to kill the State's lead witness, assaulted a man with a straight razor, and kidnapped another person with a knife." *Id.* There was also evidence that he "had a history of violent outbursts, including striking and threatening a bailiff after a court proceeding at age 17, breaking his wife's jaw, resisting arrest by faking seizures, and assaulting and spitting on police officers." *Id.* Moreover, the jury in *Pinholster* heard about the defendant's

> involvement in juvenile gangs and his substantial disciplinary record in both county and state jails, where he had threatened, assaulted, and thrown urine at guards, [] fought with other inmates . . . [and] had been segregated for a time due to his propensity for violence and placed on a 'special disciplinary diet' reserved only for the most disruptive inmates.

*Id.* Doe's criminal record – the only aggravating evidence presented by the state at the penalty phase – was light compared to those of many capital defendants; his only previous conviction was for an armed robbery, in which no one was injured, committed when he was a juvenile.

When compared with the offenses of other death-eligible defendants, all of which necessarily involve egregious crimes

---

to have left to retrieve the key from management without confronting him; when they returned, this man had disappeared.

of violence,[33] the facts of the crime Doe committed were also not particularly aggravating;[34] notably, although the jury rendered a finding of true on the felony-murder-burglary special-circumstance allegation, it rendered a finding of not true on the felony-murder-rape special-circumstance allegation. We have found prejudice from failure to present mitigating evidence in cases involving crimes substantially more heinous than Doe's. *Correll*,[35] 539 F.3d at 951–55 (holding that the defendant was prejudiced by counsel's failure to present mitigating evidence despite the fact that he kidnaped three people, bound their hands and feet with duct tape, drove them into the desert, shot one of them in the head execution-style, and watched as a friend of his killed the other two); *Ainsworth v. Woodford*, 268 F.3d 868, 870–71, 878 (9th Cir. 2001) (holding that the defendant was prejudiced by counsel's failure to present mitigating evidence despite the

---

[33] Of course, all murders are, by their very nature, horrific – capital murders even more so. We must view the facts of Doe's offense, however, in relation to those of other capital murders. It is only in that light that we conclude that his crime was not *especially* egregious.

[34] Additionally, our case law is "clear that the presentation of mitigating evidence is vital even where . . . the aggravating evidence is powerful." *Stankewitz,* 365 F.3d at 714 (citing *Wiggins*, 539 U.S. 510; *Williams*, 529 U.S. 362). We may find prejudice despite the horrific nature of an underlying crime. *See Douglas*, 316 F.3d at 1091 ("The gruesome nature of the killing did not necessarily mean the death penalty was unavoidable."); *Smith v. Stewart*, 189 F.3d 1004, 1013 (9th Cir. 1999) ("The horrific nature of the crimes involved here does not cause us to find an absence of prejudice."); *Hendricks*, 70 F.3d at 1044 ("[D]espite . . . substantial evidence of aggravation, . . . the failure . . . to present mitigating evidence rendered the sentencing hearing neither fair nor reliable.").

[35] The facts of the offense are drawn from *Correll v. Stewart*, 137 F.3d 1404, 1408–09 (9th Cir. 1998).

fact that he shot a woman in the hip, raped her as she bled from the gunshot wound, and confined her in her car, at times in the trunk, for twenty-four hours until she bled to death); *Hendricks*,[36] 70 F.3d at 1044–45 (holding that the defendant was prejudiced by counsel's failure to present mitigating evidence despite the fact that he was convicted of murdering two men who had paid him for sex by shooting them to death at point-blank range, and was not charged with murdering three others).

## B.  Mitigating Evidence at Trial

J.B.'s penalty-phase evidentiary presentation was brief (the testimony of the five witnesses spanned only 35 pages of trial transcript), haphazard, and thoroughly underwhelming. Only two of the five witnesses had even known Doe since before he had moved to California, a few years prior, and the only one who testified about his life before that point was his mother.

Doe's mother testified that Doe's uncle "did most of the discipline" and would "whip him and as he got older he'd use more physical violence with him," but "not before [the age of] five" – "[at] about the age of maybe 11, 12." She said that Doe's uncle was "very stern," and that as "[Doe] grew older he handled him more roughly than he did when he was younger." She stated that she moved out of the house during Doe's childhood, but moved back in with her mother a few years later. She said that while she was doing domestic work, her mother would care for Doe. She explained that when she married her husband, Doe, then a teenager, had "become

---

[36] The facts of the offense are drawn from *Hendricks v. Vasquez*, 974 F.2d 1099, 1102 (9th Cir. 1992).

withdrawn," and "would stay in his room, you know, sit in the dark"; she reported that she had taken him to see a social worker or psychologist weekly for some months. She stated that a few days before Doe committed the armed robbery, when she was eight months pregnant, Doe and his uncle got into a fight; his uncle "tried to hit him with a car but [hit her] instead[,]" sending her to the hospital. She testified that Doe had never been in trouble before and behaved and performed well in school, that she visited him often in prison, and that her husband had also been incarcerated in the same prison. She said that after Doe's release, "[h]e was very nervous." She stated that for years, Doe had no contact with his father or paternal grandmother. She concluded her testimony by telling the jury that she loved Doe, and asking it to spare his life.[37]

The second witness, D.P., had been a live-in girlfriend of Doe's in California. When they lived together in an apartment complex she owned, he helped out as a handyman, and was "very loving and very affectionate" in taking care of her young children. Although she broke up with Doe, they had remained in touch. She described him as "compassionate, warm and considerate of other people. Sometimes angry, sometimes just crushed." She said that he "showed me nothing but love and affection" and that "he was the first and

---

[37] Although there were glimmers of mitigation in Doe's mother's testimony at the penalty phase, J.B. introduced this evidence "in a cursory manner that was not particularly useful or compelling." *Stankewitz*, 365 F.3d at 724 (quoting *Douglas*, 316 F.3d at 1090; citing *Bean v. Calderon*, 163 F.3d 1073, 1081 (9th Cir. 1998) (considering that "potentially mitigating factors . . . were reported to the jury only in the vaguest of terms" in concluding that confidence in the outcome was undermined as a result of counsel's failure to present mitigating evidence)).

only man that I have been involved with that I let my children have any direct immediate contact with," and that "they love him and talk to him all the time." She said that if he were released from prison (and even if not), she would marry him, and asked the jury to "[l]et him live."

The third witness, E.B., met Doe while he was in jail in California, awaiting trial for murder. She studied the Bible with him regularly and spoke with him on a daily basis. She testified that Doe had participated in religious classes, taken tests, and obtained certificates, and that he had begun to organize Bible study classes.

The fourth witness, Doe's father, J.A., had only met Doe a few years earlier. He testified that he had reconnected with his son because when his mother fell ill, she asked to see Doe before she died. Doe lived with him briefly, but then went to live with J.A.'s niece. J.A. also explained that his new wife had expressed concern that Doe's presence in their home might lead him to get in contact with Doe's mother. Doe's father did not know that Doe had been in prison in his home state.

The fifth witness, Doe's aunt, had known him for decades, but was asked – and testified – only about events that occurred after his arrival in California. She stated that he had lived with her, and that she had helped him find temporary work. She testified further that her husband "blew up" at him over a disagreement and kicked him out of the house, but that Doe had remained calm while her husband threatened violence. She acknowledged that she had "pretty strong feelings, love towards [Doe]," and said that she would "stand behind him" if he was allowed to live.

The mitigating evidence that was introduced at Doe's trial was quite bland, and apparently proved insufficient to overcome even the relatively minimal presentation of aggravating evidence offered by the state. It is not altogether surprising that not a single member of the jury voted for life without parole instead of death on the basis of J.B.'s inept penalty-phase presentation.

Because the aggravating evidence presented in the penalty phase was, for a capital case, relatively minimal, and any meaningful mitigating evidence virtually nonexistent, Doe will have successfully shown prejudice if he has adduced strong mitigating evidence in his habeas proceedings.

### C.  Mitigating Evidence Not Introduced at Trial

The powerful evidence introduced in the habeas proceedings at the district court, by contrast, represented the fruits of an appropriate mitigation investigation. Doe's habeas counsel reviewed Doe's complete prison record and other records, and conducted in-depth, targeted interviews with family members and friends, as well as with fellow prisoners who had known Doe during his incarceration. Habeas counsel also retained two psychological experts[38] to conduct a

---

[38] The first, Dr. J.C., has a Ph.D. in social psychology. Dr. J.C. was given instructions to undertake the sort of mitigation investigation Dr. M.R. was never hired to conduct; she was asked to "evaluate his social history and background, paying particular attention to his familial, cultural, medical, and psychiatric history[,] . . . [and to] discuss the effects of that social background on [Doe's] psychological development, as well as on his level of functioning . . . as a teenager while incarcerated . . . ." The second, E.P., a clinical psychologist, had previously been qualified as an expert witness on male sexual victimization in prisons. Both reviewed documents provided by Doe's habeas counsel and conducted interviews.

penalty-phase mitigation investigation, and equipped them with relevant records and witness declarations. Finally, he obtained declarations from experts on corrections in Doe's home state.

It is plain that although "[t]his evidence might not have made [him] any more likable to the jury, . . . it might well have helped the jury *understand* [him], and his horrendous acts . . . ." *Sears v. Upton*, 561 U.S. 945, 951 (2010) (emphasis added). "Rather than creating the risk of an unguided emotional response, full consideration of evidence that mitigates against the death penalty is essential if the jury is to give a "reasoned *moral* response to the defendant's background, character, and crime." *Penry v. Lynaugh*, 492 U.S. 302, 328 (1989) (citations and internal quotation marks omitted), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002). The Supreme Court has long made clear that "fundamental respect for humanity . . .

---

The state incorrectly suggests that the expert testimony of Dr. J.C. and E.P. would not have been admissible at trial. Under California's Evidence Code, an expert witness may offer opinions based on "matter (including his special knowledge, skill, experience, training, and education) . . . made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates . . . ." Cal. Evid. Code § 801(b). The sorts of material on which Dr. J.C. and E.P. relied – prison records, interviews with Doe, his family members and friends, and prisoner affidavits – are those on which any adequate mitigation investigator not only may but must rely. *See Heishman*, 621 F.3d at 1041 n.3 ("[T]rial counsel could have presented expert psychological testimony regarding [defendant]'s diagnosis for post-traumatic stress disorder. If so, the expert would have been able to base her opinions on inadmissible hearsay – [his] out-of-court statements regarding sexual abuse – and to discuss both those opinions and the underlying hearsay in court, just as [defendant]'s experts have done in these habeas proceedings.").

requires consideration of the character and record of the individual offender," because therein may lie "compassionate or mitigating factors stemming from the diverse frailties of humankind." *Woodson v. N. Carolina*, 428 U.S. 280, 304 (1976). Doe should have been presented to and considered by the jury as a "uniquely individual human being[]," who endured the trauma we now recount. *Id.*

### 1. Rape in Prison

The most compelling mitigating evidence that J.B. failed to discover was also the easiest to obtain. There was reliable evidence, in documents that J.B.'s investigator specifically instructed him to request and in testimony from a prison guard and multiple prisoners,[39] that Doe – then a 17-year-old

---

[39] The state argues that the evidence from which defense counsel could have established that Doe was repeatedly raped in prison would not have been credible. This is not the case. The fact that Doe was repeatedly and violently assaulted by other prisoners is very well corroborated, through the combination of his prison records, his own statements as reported by two psychological experts, the declarations of some family members and friends, the declarations of a number of fellow prisoners, and the confirmatory declarations of two prison experts with knowledge of the prison. The evidence is detailed and consistent. At the hearing in the district court, counsel for the state was apparently so unconcerned with refuting the testimony of those prisoners that he accepted the submission of their declarations and waived the right to cross-examine them.

P.P., a warden at the prison just before Doe's term of incarceration, concluded based on his review Doe's prison record that it was "extremely likely that petitioner [Doe] was repeatedly subjected to forced sexual contact by other inmates during his incarceration . . . ."

Another expert, D.B.F., an associate professor of criminal justice, had served as an expert on jails and prisons in state and federal courts in Doe's

boy who had never been involved with the criminal justice system before his conviction for stealing two purses – was brutally and repeatedly raped while he was incarcerated. Doe himself, when asked directly about his experience by trained mental health professionals equipped with his records and charged with the task of discovering information relevant to the penalty phase, disclosed his abuse in vividly painful detail. However, evidence concerning Doe's chilling, brutal experience in prison was completely absent from the penalty phase of the trial. Had J.B. conducted an adequate investigation, he would have discovered this information and could have presented it, along with psychological expert testimony explaining its impact, to the jury.

Dr. J.C. reported, based on her review of Doe's prison record and the interviews she conducted with Doe and others, that he experienced "a series of violent physical and sexual

---

home state. D.B.F. described the notorious prison in which Doe was incarcerated:

> The strong ruled, and the weak either served or perished. Sexual abuse and homosexual slavery were widespread, with inmates auctioned, sold and traded like cattle by other inmates. . . . Many young inmates – black and white – who came to [the prison] in the 1970s to serve short terms for less serious felonies ended up with much longer sentences, including natural life terms, for trying to escape or fighting back, sometimes to the death, against rape and exploitation.

The rampant sexual violence in this prison was also acknowledged by another former warden in his memoir. (Citation omitted.)

Even if jurors were inclined to doubt the truthfulness of prisoners' testimony, they would presumably credit that of a warden and a professor.

assaults directed at him by other prisoners."[40] He was only 17 years old when his incarceration – and brutalization – began.[41] She noted that his records from the penitentiary hospital include entries showing that he suffered lacerations, bruises, and fractures consistent with these assaults. E.P. found, during his review of Doe's prison records, "a report by a guard stating that he saw [Doe] lying on the seat of a garbage truck face down with his jump suit pulled down below his knees and inmate [R.S.] lying on [Doe] with his penis in [Doe]'s rectum."[42]

---

[40] It is unclear how many times Doe was raped. E.P. noted that Doe told him he had been raped three times, but that other sources reported many more. "It is common for male victims of prison rape to under-report the number of times they have been raped," he explained, "because of the shame and trauma associated with prison rape." E.P. believed that Doe had been raped more than three times.

Additionally, Dr. J.C. received a report from a close friend of Doe's that he was raped in the jail where he was held prior to being transferred to prison. Doe also revealed that he suffered violence at the hands of guards, including gassing and starvation, which he described as a "nightmare." His aunt also reported hearing from a cousin of Doe's, N.M., that guards had beaten and kicked Doe until his clothes came off and he urinated and defecated on himself. However, because these incidents are not corroborated elsewhere in the record, we have not weighed them in mitigation.

[41] Youth is one of the primary risk factors for sexual victimization in prison. Prison Rape Elimination Act of 2003, Pub. L. No. 108-79, § 2, 117 Stat. 972, 972; *see also National Prison Rape Elimination Commission Report* 7 (June 2009) ("Youth, small stature, and lack of experience in correctional facilities appear to increase the risk of sexual abuse by other prisoners.").

[42] At least one guard observed Doe's sexual abuse firsthand. G.M. spoke positively of Doe: "[Doe] was an inmate who listened. . . . I saw [Doe]

These assaults were not only physically painful but terrifying.[43]

---

share his food with other inmates. I liked him and I never had any trouble with him. He was just a young kid when he was [in prison]." He reported:

> During the 17 years I worked at [the prison] full-time, I wrote up inmates for infractions of the rules a total of twelve times. One of those twelve times . . . I was tipped off by a third inmate . . . that something was going on in a garbage truck. When I went to investigate, I found [an inmate, R.S.] having anal sex with [Doe] who was bent over the front seat of the truck. . . . [R.S.] was a much bigger man than [Doe].

The fact that guards did not observe – or at least did not report – the other occasions when Doe was raped is hardly surprising, given that the dorms in this prison were not staffed at night. One prisoner, D.S., explained that "the dorms were wild and out of control at night. Young inmates were regularly raped, inmates were routinely killed. No one was safe. . . . The guards just didn't care what went on out of their sight." Another prisoner, A.S., said that "the mentality of the guards was to let it all happen and ignore the inmates getting hurt as a means of keeping control."

In the same year this case began, another circuit denounced "the inability or unwillingness of some prison administrators to take the necessary steps to protect their prisoners from sexual and physical assaults by other inmates" as "a national disgrace." *Martin v. White*, 742 F.2d 469, 470 (8th Cir. 1984).

[43] *See Coker v. Georgia*, 433 U.S. 584, 611–12 (1977) (Burger, C.J., dissenting) ("[Rape] not only violates a victim's privacy and personal integrity, but inevitably causes serious psychological as well as physical harm in the process. The long range effect upon the victim's life and health is likely to be irreparable; it is impossible to measure the harm which results. Volumes have been written by victims, physicians, and psychiatric specialists on the lasting injury suffered by rape victims. Rape is not a mere physical attack it is destructive of the human personality. The remainder of the victim's life may be gravely affected . . . . [S]hort of

[Doe] was told by another inmate . . . that [P.], one of the stronger and most powerful inmates in his Camp, had stated [Doe] was going to be his "punk" and if [Doe] didn't submit, [P.] was going to take his life. Another inmate [J.E.] physically assaulted [Doe] and told him he would be his "gal boy" or he would die.

Doe reported that he "remembers lying on the floor after one of these physical assaults wondering[,] '[H]ow am I gonna survive? Can I make it out of here alive?'"

Doe told Dr. J.C. that

One particular sexual assault was immensely painful for [him]. In this incident, [Doe] was beaten and anally raped by [J.J.], a man with whom he had become close friends during the time he had already spent [in prison]. . . . Thus, when [J.J.] turned and sexually assaulted [Doe] in the shower, leaving him lying on the bathroom floor, [Doe]'s pervasive sense of powerlessness, shame, and rage was further complicated by his experience of betrayal by a man he had grown

---

homicide, [rape] is the ultimate violation of self. . . . Victims may recover from the physical damage of knife or bullet wounds, or a beating with fists or a club, but recovery from such a gross assault on the human personality is not healed by medicine or surgery." (citations and internal quotation marks omitted)).

to trust.[44] As [Doe] describes it, "I wasn't the same after that; I wonder why I didn't kill myself then."[45]

---

[44] It also appears that other rapes were arranged by people who knew Doe, including his own stepfather, B.G., who had served time in the same prison, and a man from Doe's neighborhood, R.R., the uncle of a friend, who was incarcerated at the same time. Dr. J.C. stated:

> [Doe]'s traumatic experiences [in prison] may have been even more painful to him due to the knowledge that at least some of the assaults may have been arranged by his mother's husband. Family members report that [B.G.], [Doe]'s mother's husband at the time [Doe] entered [prison], had it in for [Doe] and set it up so that [Doe] would be raped.

Doe's aunt heard from her nephew, N.M., that this was true. Two prisoners independently stated as much. One said:

> [R.R.] saw to it that [Doe] was taken to the gym and set up. At the gym, [Doe] was forced to go into a room with various guys who forced him to have sex with them. . . . After that [Doe] tried to keep on running. The problem was that [R.R.] had too many friends in the main prison. Even though [Doe] kept moving from camp to camp, he was never safe.

[45] In fact, Doe did hurt himself. Dr. J.C. discovered, upon review of Doe's prison records, that they "document [Doe]'s attempts to harm himself by mutilating his right forearm and wrists." She noted that in her expert opinion, "[t]his suicidal gesture is not surprising given that [Doe]'s long-standing depression had been complicated by feelings of betrayal, shame, and rage, along with ongoing anxiety regarding continued future assaults."

On another occasion, Doe told E.P., he was "raped in a full dormitory, in front of all the other inmates there at the time."[46] A different time, Doe

> was walking on the grounds when he was grabbed and pulled to the ground with a knife to the throat [and raped]. [Doe] says about this experience, "I had come too far to die up in this place here," which of course was his primary concern. . . . When he was released [Doe] was "just glad to get out of there walking."

Powerful prisoners apparently controlled Doe no matter where he moved in prison. E.B., a prisoner who knew Doe, said:

> The older inmates got [Doe] when he first came to [prison]. . . . An older inmate put a claim on [Doe]as his own. [Doe] was moved to . . . a camp here, . . . for protection. . . . [Doe] could have tried to get away from [B.] and from being forced to have sex with other inmates by moving from one camp to another, but [Doe] never would have been able to really get away. Once [Doe] was owned by

---

[46] Doe told E.P. that he had "blocked . . . out" the memory of this particular rape until he was released. E.P. explained that this "dissociative event," a "symptom of Post-Traumatic Stress Disorder," "indicates the relative severity of this particular rape, which was much more public and therefore more shameful than the prior rape. The public nature of it would also represent greater danger since that kind of branding in the prison culture can lead to many more rape attempts."

> [B.], it would have been impossible for [Doe]
> to be safe anywhere inside [the prison].

A.R., who knew Doe when he was growing up and when he was incarcerated, explained based on his knowledge of the prison:

> Once an inmate is forced to become some guy's lover, that's it. And that inmate wouldn't just be forced to have sex with the one inmate, he would be forced into prostitution for the benefit of the inmate who owned him – often for just a carton of cigarettes. . . . The inmate who owned him would send word to the new cell or dorm that [Doe] belonged to him. Someone in the new setting would be charged with taking care of [Doe] for the first inmate, and it would all start again. [Doe] would have had no way to escape the life he was forced into. He would have been utterly trapped.[47]

Dr. J.C. observed that Doe, in his efforts to escape harm, changed his custody or work assignment 73 times in less than five years. Many of his requests to be transferred to administrative lockdown were made in the early hours of the morning; as other prisoners corroborated, assaults often occurred at night. (Again, this striking evidence, like the evidence of Doe's self-harming, was available in the prison

---

[47] *Cf. LaMarca v. Turner*, 662 F. Supp. 647, 686 (S.D. Fla. 1987) ("[O]nce an inmate is raped, he is marked as a victim for repeated sexual assaults for the remainder of his imprisonment."), *aff'd in part and vacated in part on other grounds*, 995 F.2d 1526 (11th Cir. 1993).

record J.B. neglected to request.) During their interview, Doe told E.P. that he arranged to be "sent to solitary confinement by getting himself written up for failing to obey a directive or by deliberately being disrespectful to guards."[48]

As Dr. J.C. put it, "After the assault by [J.J.] and by the other strong prisoners, [Doe] had earned the label of 'galboy' and from that point on, lived a 'cat and mouse game,' repeatedly requesting transfers, protective custody, and administrative lockdown." E.P. opined that the fact that Doe "elected to experience the psychological trauma of solitary confinement to reduce the risk of continued sexual assaults underscores how terrifying and repulsive he found the idea of being sexually approached and violated by fellow inmates." D.B.F., the professor of criminal justice, concluded that Doe's "constant[] moving reflect[s] that he must have been in a constant state of fear. . . . I expect [Doe] was one of those who left [the prison] very messed up."

Not only did Doe suffer the trauma of sexual victimization and subordination; upon his release, he had to face friends and family members who knew of his

---

[48] Another prisoner, P.M., suggested that Doe had deliberately injured himself in order to effectuate a transfer. D.B.F. noted that assignment to isolation would have rendered Doe "ineligible for work, recreation, free time on the yard, membership in inmate organizations, or other aspects of normal social interaction." However, P.R., an inmate counselor who reviewed Doe's files, doubted whether even isolation would have ensured his safety, given that sexual assaults often occurred in that unit as well. He suggested that "[i]n order to have any measure of safety during the particular years [Doe] was here, he would have had to become partners with another inmate for protection."

humiliation.**[49]** He had trouble upon his return home as a result. As one fellow prisoner, A.S., whose sister had told him that Doe had "a lot of trouble on the street because guys had heard what happened to him," put it: "The stigma of all that followed [Doe] back home . . . ." In a letter to a girlfriend, I.R. – one who told D.S. in a taped interview that Doe had been "fresh meat" from whom other prisoners "got some" – Doe wrote: "You told me once I was a whore in there. And that really hurt me . . . . And when you told me that, I just felt like you didn't have any more respect for me as being a man."

This evidence is powerful. As another prisoner, A.R., stated in his declaration, "Prison rape is the most devastating thing you can experience."**[50]** Undoubtedly, this evidence

---

**[49]** The (widely corroborated) fact that many of Doe's friends and relatives knew about the rape makes even more obvious how utterly inadequate J.B.'s mitigation investigation was. According to A.S., a neighbor, Doe's own mother knew. She might well have revealed this information to J.B. or D.S., if they had only asked.

**[50]** For decades, the federal courts have recognized how powerfully damaging the experience of "confinement in a prison where violence and terror reign" would be to a prisoner, in clearly recognizing "a right, secured by the eighth and fourteenth amendments, to be reasonably protected from constant threat of violence and sexual assault by [] fellow inmates . . . ." *Woodhous v. Virginia*, 487 F.2d 889, 890 (4th Cir. 1973); *see also Farmer v. Brennan*, 511 U.S. 825, 834 (1994) ("Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981))); *id.* at 853 & n.* (Blackmun, J., concurring) ("The horrors experienced by many young inmates, particularly those who . . . are convicted of nonviolent offenses, border on the unimaginable. Prison rape not only threatens the lives of those who fall prey to their aggressors, but is potentially devastating to the human spirit. Shame, depression, and a shattering loss of self-esteem, accompany the

would have moved at least some of the jurors who decided Doe's punishment.**51** The Constitution requires that the sentencing jury's decision "reflect a reasoned *moral* response

---

perpetual terror the victim thereafter must endure."); *cf. United States v. Rodriguez*, 213 F. Supp. 2d 1298, *supplemented*, 214 F. Supp. 2d 1239 (M.D. Ala. 2002) (concluding that a defendant's rape in prison warranted a downward departure in the sentence).

**51** The district court inappropriately dismissed the impact of Doe's rape in prison, finding that "[w]hile prison abuse is inexcusable, the reserve of empathy for prisoners is shallow." Profoundly traumatic experiences in prison have served as highly effective mitigation in other capital cases. *See, e.g.*, *Douglas*, 316 F.3d at 1089–90 (concluding that trial counsel's penalty-phase performance was prejudicially ineffective in part because he failed to introduce evidence that the defendant "was arrested and put in a Florida jail where he was beaten and gang-raped by other inmates" in his late teens, despite the fact that the defendant was convicted of sexually assaulting and murdering two teenage girls).

While not everyone is sympathetic to the plight of prisoners who are sexually assaulted, most are – and this sympathy is not new. A 1994 poll found that 78% of respondents did not accept rape as "part of the price criminals pay for wrongdoing"; 59% thought being raped "constituted a violation of an inmate's constitutional protection against cruel and unusual punishment under the Eighth Amendment" even before the Supreme Court decided the question in *Farmer v. Brennan*, 511 U.S. 825 (1994). Charles M. Sennott, *Poll Finds Wide Concern About Prison Rape; Most Favor Condoms for Inmates*, Boston Globe, May 17, 1994. Nor is the horror of prison rape recognized only by a political subset of the American population. The Prison Rape Elimination Act was a model of bipartisan cooperation, and it passed both houses unanimously. *See* Pat Nolan & Marguerite Telford, *Indifferent No More: People of Faith Mobilize to End Prison Rape*, 32 J. Legis. 129, 139 (2006) (noting that the coalition to pass the Prison Rape Elimination Act was an "unlikely amalgam of groups" and observing that it "recruited legislators from across the political spectrum"). While some jurors might dismiss all acts of violence against those serving criminal sentences out of hand, many would feel sympathy for or even perhaps identify with Doe's experience of sexual brutalization.

to the defendant's background, character, and crime." *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring) (emphasis in original). We are convinced that if the jury had heard about what had happened to Doe in "that man-made hell," this evidence alone would have stirred sufficient compassion or understanding in the jury to result in a life sentence.

## 2. Mental Illness

The psychological impacts of Doe's experience in prison were obvious to those who knew him. His ex-girlfriend, I.R., said: "I think he was a crazy man. But he wasn't like that in the beginning [before prison]." A cousin, N.M., said his time in prison had "caused [Doe] to go crazy." Doe was "slipping in the head." A neighbor and friend, A.S., said:

> [Doe] seemed like a troubled young man to me. He was not really all there. . . . It didn't take a psychiatrist to see there was something eating at [Doe]. . . . [Doe] told me he had problems . . . . I believe in my heart that what happened to [Doe] [in prison] wrecked his mind. The system didn't help him, it just broke him. Those experiences of being raped are stuck in [Doe]'s head. He would never talk about it and let any of those feelings out.

Another friend, J.A., put it thus: "He was like people who come back from Vietnam and could never talk about their time there."[52]

---

[52] Doe's mother and aunt also said that he did not talk about his experiences in prison.

Behaviorally, Doe was off. "A lot of things he said didn't make sense" to J.A. He was "extremely jumpy," "nervous," and "jittery." He "couldn't keep still," "wasn't sleeping," "would walk around the house all night long," and was "easily upset and agitated." Sometimes he "would just sit and not speak," even when spoken to. I.R., who had known him all his life and with whom he was romantically involved after his release, believed that he "needed some psychiatric counseling after being confined for five whole years" and that perhaps he became "angry over flashbacks." She said, as Dr. J.C. noted, that "he could go out of control when he was under the influence of alcohol or drugs and it seemed . . . that [Doe] has a split personality – that he seemed to be schizophrenic. [Doe] could be warm and loving one minute, then the next minute 'tripped out.'"[53]

The impacts of Doe's trauma did not recede with time. A year and a half after his release, his mother arranged for him to see a mental health specialist; the intake sheet noted that she "[r]eport[ed] [Doe] was in [] prison for 6 years and [his mother] feels it has done something to him – he's nervous, not violent . . . ." During intake, he said he was suffering from "nerves," "inappropriate laughter," "depression/blues,"

---

[53] A friend, A.S., reported that after his release,

> [Doe] was very tense and would quickly become agitated and upset over minor irritations. To me it seemed that [Doe] had great difficulty dealing with any pressure or stress. I saw [Doe] fly into a serious rage two or three times. . . . [Doe] never seemed able to control his anger or emotions, much as he wanted to and tried. . . . I would describe [Doe] as schizo, just two completely different people in the same body. Anger would just spew out of [Doe] at times.

"inability to stay still," "problems with temper/anger," "feelings that people are out to get me," and "feelings of hopelessness/helplessness." His mood was described as "depressed" in a mental health evaluation that day. Doe told Dr. J.C. that he remembered not caring about anything and wanting only to be isolated. It was recommended that he attend weekly psychotherapy sessions and Alcoholics Anonymous; it seems that he did not.

After Doe was taken into custody for his current offense, he wrote in a letter to I.R. that the abuse he suffered in prison "play[ed] a part in the destruction of my life. But I thought I was handl[ing] it good, until I got out of that hell hole, I was so immature, with man's body, but a young and very confused mind." He went on to explain that he

> need[ed] someone so bad after all that shit I went through in that man-made hell, but there wasn't anyone to turn to. I couldn't turn to you not by you fully respecting me as something happen[ed] to me that you [or] no one would understand. . . . [M]y life was destroy[ed] after doing five years, seven months, and sixteen days in that hell hole . . . .

Dr. J.C. was able, as an expert, to place Doe's trauma in psychological context. She explained:

> A man who is raped experiences powerful feelings of shame, guilt, and rage; yet, a man who must remain in an environment of continued sexual assault is forced to internalize these feelings in order to play the role that is intended for him and survive the

experience. Research suggests that the combination of physical and sexual assault with little recourse to justice, humiliation by both attacker and by others in the prison, and the requirement for continued submission to sexual demands constitutes formidable pressure resulting in severe psychological reactions. These feelings and reactions would have been compounded for [Doe] by his history of being physically dominated by his stronger, more powerful Uncle [J.C.] throughout his childhood and adolescence and by the severe neglect he experienced as an infant at the hands of his mother.

Dr. J.C. explained that prison left him ravaged by significant mental illness: "Upon discharge, he was a broken man. He suffered from symptoms consistent with Post-traumatic Stress Disorder [PTSD],[54] Major Depression,[55] and,

---

[54] The district court mischaracterized Doe's serious mental illness as "extremely mild mental problems." PTSD is a "grave affliction." *United States v. Cantu*, 12 F.3d 1506, 1512, 1513 (9th Cir. 1993); *see also United States v. Menyweather*, 447 F.3d 625, 628, 632 (9th Cir. 2006) (recognizing that chronic PTSD symptoms are linked to compulsive behavior and an inability to make reasoned decisions).

Dr. J.C. explained the distressing symptoms of PTSD, including flashbacks, sleep disturbed by nightmares, difficulty concentrating, anxiety or fear, panic, anger, feeling the need to defend oneself, and difficulty controlling emotions. She stated:

Increased arousal is a common response to trauma. Their bodies are on constant alert, always ready to respond immediately to any attack. This includes

feeling jumpy, jittery, shaky, being easily startled, and having trouble concentrating.

She added:

> Aggressive behavior towards oneself or others can result from frustration over the inability to control PTSD symptoms. . . . The victimization [Doe] suffered [in prison], coupled with his traumatic childhood and adolescence, and lack of guidance or modeling in healthy relationships, led to his inability to manage intense negative emotions and his tendency to act out physically in the way he had been taught to act throughout his childhood.

She also noted that Doe's substance abuse would "exacerbate [his] inability to suppress or control violent behavior." E.P. gave a similar explanation.

[55] She explained that depression was often a result of trauma:

> Ways of avoiding thoughts, feelings, and sensations associated with trauma can include avoiding conversations, shutting down emotionally or feeling emotionally numb, trouble having loving feelings or feeling any strong emotions, feeling strange or disconnected from the world, feeling weird physical sensations and losing interest in the things one used to enjoy.

She elaborated:

> People who have experienced trauma often have problems in relationships with others because they have a hard time feeling close to people or trusting them. This is especially likely to happen when the trauma was caused or worsened by people known to the victim (as opposed to an accident or natural disaster).

in a continued attempt to self-medicate against the pain and escape from the daily horror of his memories, quickly redeveloped a Poly-substance Dependence."[56] She noted that he "experienced all but one (combat exposure) of the traumatic events most often associated with PTSD in men": childhood neglect, childhood physical abuse, and rape.[57] In diagnosing Doe with Major Depression, Dr. J.C. observed that his depression began in his childhood but was exacerbated by his experience in prison.[58]

---

This did occur for Doe, as evidenced by the fact that he refused to speak about what happened to him in prison with his aunt, with whom he was very close.

[56] The habeas court also considered the report of a California prison psychiatrist who found "evidence of organic brain dysfunction." The district court dismissed this evidence, stating, without support, that "[a] dysfunction is less than a disorder, disease, or defect." However, because Doe does not rely on this solitary piece of evidence in his briefing before us, and because it is superfluous to our conclusion, we do not consider it further.

[57] This diagnosis is hardly surprising. *See National Prison Rape Elimination Commission Report* 14 (June 2009) ("The psychological aftereffects of sexual abuse are well documented. They include posttraumatic stress disorder, anxiety disorders, fear of loud noises or sudden movements, panic attacks, and intense flashbacks to the traumatic event. Each of these consequences alone has the ability to re-traumatize victims for years."); *id.* at 45 ("The closed nature of correctional facilities can lead to especially devastating effects for sexual abuse victims. . . . The constant threat of subsequent abuse and physical proximity to danger are likely to increase the risk of developing PTSD and other aftereffects. The consequences of sexual abuse may be worse for those who are young, have a past history of sexual abuse, or have a preexisting mental illness.").

[58] It seems that Doe had a history of depression prior to his incarceration. E.P. reported that when Doe's mother was married to B.G., he became "withdrawn, isolated and very depressed, and lost 85 pounds." Dr. J.C.

Doe establishes prejudice based on the foregoing evidence alone. There is more than a "reasonable probability that, [considering this evidence], the sentencer [i.e., at least one member of the jury] . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. His experience of brutalization as a youngster in prison and resulting mental illness are even more powerfully mitigating, however, when viewed alongside evidence of his abusive childhood and substance abuse. Hence, we turn now to those subjects.

### 3. Childhood Abuse and Neglect

As for Doe's childhood, J.B. did elicit penalty-phase testimony that his father did not support his mother, that his grandmother cared for him while his mother was working, that his uncle abused him physically,[59] and that he had emotional problems when his mother remarried. This picture of Doe's childhood, however, seriously understated the violence he suffered at the hands of his mother and his uncle, and afforded little in the way of mitigation that might be persuasive to a jury.

---

concluded that Doe had suffered another major depressive episode upon his release from prison, which only worsened after he moved to California.

[59] J.B. did not, however, elicit the painful details. Penalty-phase testimony about Doe's childhood came only from his mother; she mentioned, only briefly, that his uncle would "whip" Doe, and that he started to beat Doe when he was eleven or twelve. The violence inflicted on Doe as a child was characterized by J.B., in questioning Doe's mother, as "discipline."

Dr. J.C., who conducted interviews designed to elicit evidence of childhood abuse and neglect, learned much more. She reported that Doe's mother, herself a victim of physical and sexual abuse and an abuser of alcohol and drugs, was "virtually absent" from his life until he was six years old. When he was an infant, she abandoned him, sometimes overnight, to go out drinking. On such occasions, she would leave him wrapped in a fur coat, without food or clean clothes or diapers. Sometimes, his diapers were not changed for days, and became so filthy they were black. Neighbors saw him crawling down the hallway of his apartment, begging for something to eat. Not only was Doe's mother neglectful; she beat him with a belt or extension cord.

In Dr. J.C.'s words, Doe's "early childhood was in many ways a continuation of his experience in infancy," and his "transition from childhood to adolescence was filled with continued neglect by his mother and the other adults in his life." The testimony the jury heard did not make known that Doe was, in fact, raised largely by his violent uncle and grandmother (who once aimed a gun at him) after the age of one, because his mother was unable to take care of him.

Doe's uncle singled him out, repeatedly beating him throughout his childhood years, unpredictably and for no reason, with his fists and with sticks, sometimes on the head. He punched Doe in the head if he came home slightly late or did something perceived to be disrespectful. He once knocked Doe off a ladder, and kicked him in the head as he lay on the ground until he lost consciousness. On another occasion, he pounded Doe's head into a telephone pole. Another time, he tried to run Doe over with a car. Even after Doe was released from prison, his uncle still beat him, once with a large shovel.

Doe wrote in a letter that he was "lucky the man didn't kill me . . . ."

This evidence, too, would have been powerful. "It is well established that early childhood trauma, even if it is not consciously remembered, may have catastrophic and permanent effects on those who . . . survive it.'" *Stankewitz*, 698 F.3d at 1169 (citation omitted).

### 4. Substance Abuse

J.B. also did not present evidence of Doe's serious substance abuse at the penalty phase of his trial. While this failure alone would not have prejudiced Doe, the evidence would have helped to sway the jury towards life when considered cumulatively, alongside the other mitigating evidence.[60] Here, as Dr. J.C. explained, mitigation based on Doe's substance abuse would not simply have been additive. Rather, the evidence of his escalating dependence would have amplified the mitigating force of Doe's repeated trauma in prison, which drove him to "continued attempt[s] to self-medicate against the pain and escape from the daily horror of his memories." *Cf. Ainsworth*, 268 F.3d at 876 (concluding that failure to present evidence of substance abuse at the penalty phase was prejudicial, and noting expert testimony that the petitioner "used drugs as a form of self-medication because he lacked any other means of overcoming or even coping with his unbearable inner experience").

---

[60] There is also evidence that substance abuse was pervasive in Doe's immediate and extended family, and that he was exposed to alcohol and drugs at a young age.

A.S., who lived for many years in the same neighborhood as Doe's family and met him after his release from prison, reported that "most nights I saw [Doe] drink between seven and nine half-pints of hard liquor [and, when he was able to pour his own drinks,] even more." He added that "he just kept drinking more and more . . . which usually made him more irrational and easily upset. By the time [Doe] left for California, his drinking problem was enormous and he seemed extremely unstable."[61]

Doe told E.P. that "after his release from prison he felt profoundly depressed and anxious, which he tried to overcome by drinking alcohol to keep numb." E.P. explained, as an expert witness could have at trial, that "[t]he resort to

---

[61] Exactly which drugs he used and when is less clear. Doe told D.S. that he smoked marijuana occasionally – which contributed to his leaving school – and did two grams of cocaine per weekend after his release from prison. D.S. noted that while Doe was twice supposed to attend substance abuse treatment programs, he never did so. E.P. reviewed a statement by a classmate of Doe's, who said that Doe regularly used alcohol, marijuana, and prescription pills, and that he saw Doe snort suede cleaner. Dr. J.C. was informed that Doe consumed a variety of other, harder drugs. Though the list Dr. J.C. reported is longer, Dr. M.R. learned from Doe, before his trial, that he had used marijuana, barbituates, tranquilizers, and cocaine.

The state argues that the statements of some witnesses as to Doe's substance abuse are unreliable and perhaps exaggerated. However, the evidence of Doe's substance abuse would have been useful to the jury not to *explain* an intoxicated state that precipitated the crime, as in *Mayfield v. Woodford*, 270 F.3d 915 (9th Cir. 2001), the case the district court and state both cite, but rather to help the jurors understand that Doe had unsuccessfully attempted to self-medicate. *Cf. id.* at 931 n.17 ("[J]uries are unlikely to favor defenses based on abuse of dangerous drugs in evaluating a defendant's *culpability* for violent behavior." (emphasis added)). Hence, the precise details of his substance abuse are not critical to the prejudice inquiry.

drugs and alcohol as a means of coping with pain is common among people who are depressed and among people who have experienced significant trauma." He observed that Doe "retreated into a continual drug and alcohol haze that helped him to turn off the recurring traumatic thoughts. Trauma is often most effectively treated through a combination of psychological counseling and psychotropic medications, none of which were available to [Doe]."

Evidence about Doe's childhood would have demonstrated to the jury that the trauma he suffered in prison was not isolated, but rather the most disturbing of multiple episodes in a horrific series that stretched back to his birth. Evidence about his substance abuse would have highlighted his inability to cope with his violation in prison. We have concluded that the evidence of Doe's repeated rape in prison and its detrimental effects on his mental health is sufficient to establish prejudice; this additional mitigating evidence, which J.B. likewise failed to present, only strengthens that conclusion.[62]

---

[62] Like materiality in the *Brady* context, prejudice resulting from ineffective assistance of counsel must be "considered collectively, not item by item." *Kyles v. Whitley*, 514 U.S. 419, 436 (1995); *see also Silva*, 279 F.3d at 834 ("[C]umulative prejudice from trial counsel's deficiencies may amount to sufficient grounds for a finding of ineffectiveness of counsel."). This is particularly true when, as here, the different pieces of mitigating evidence fit together into an internally coherent and compelling narrative whole. As E.P. put it, after assessing Doe, "The trauma inflicted on [Doe] [in prison] built upon the trauma from his childhood – the parental neglect, the beatings by [Doe's] Uncle [J.C.], the depression, the substance abuse. [Doe] entered [prison] a depressed, traumatized, addictive young man and left as a severely more compromised individual."

## D. Comparison to Other Cases

The determination whether a petitioner was prejudiced by his lawyer's failure to discover and present mitigating evidence is an inherently fact-intensive inquiry, and requires close consideration of individual records, rather than oversimplified, ordinal comparisons between summaries of the suffering experienced by capital defendants. Such judgments are "uniquely moral decision[s] in which bright line rules have a limited place." *Hendricks*, 70 F.3d at 1044.

That said, our finding of prejudice to Doe is indeed supported by just such a comparison; we have found prejudice in other similar cases. *See Douglas*, 316 F.3d at 1088–90 (mitigation not presented at trial included evidence that the defendant was raised by an alcoholic foster father who locked him in a closet, had to scavenge for food, was beaten and gang-raped by other prisoners when he was a teenager, was decorated in the Marines, suffered a head injury, and consumed a lot of alcohol); s*ee also Karis v. Calderon*, 283 F.3d 1117, 1137–41 (9th Cir. 2002) (mitigation not presented at trial included evidence that the

---

Had J.B. conducted an adequate mitigation investigation, he would, by his own admission, have presented a very different story: one of significant childhood abuse and neglect, compounded by the trauma of repeated sexual victimization and subjugation beginning at the age of 17, and leading to significant mental health problems and efforts to self-medicate. It is well recognized that the mitigating factors present in Doe's case are characteristically interrelated. *See National Prison Rape Elimination Commission Report* 47 (June 2009) ("Individuals dealing with the consequences of sexual abuse may find it difficult to reintegrate into society, relate to their families, and rebuild their lives. Some self-medicate with alcohol and drugs to escape emotional or physical suffering. Some turn back to crime, become homeless, or reenter the criminal justice system.").

defendant's father was violently abusive towards his mother during his early childhood, that the defendant occasionally returned from visits to his father with suspicious injuries, and that his mother's second husband also beat and controlled her, and mistreated the defendant); *Silva*, 279 F.3d at 847 n.17 (mitigation not presented at trial included evidence that the defendant had been "severely abused and neglected as a child by alcoholic and impoverished parents; . . . [and] that he likely suffers from Post-Traumatic Stress Disorder" as well as a brain disorder stemming from alcohol and drug abuse); *Jackson*, 211 F.3d 1148, 1163 (9th Cir. 2000) (mitigation not presented at trial included evidence that the defendant "suffered repeated beatings in childhood, and that his mother choked him when angry with him," that his "childhood and adolescence were characterized by neglect and instability," and that he "exhibited signs of mental illness" as a child);[63] *Hendricks*, 70 F.3d at 1037, 1044 (mitigation not presented at trial included evidence of the defendant's "alleged history as a victim of sexual abuse and possible genetic predisposition to various psychiatric disorders," "hard childhood, [and] drug problems"); *cf. Miles v. Ryan*, 713 F.3d 477, 492–93 (9th Cir. 2012) (declining to find prejudice in a case where the defendant may have observed violence in connection with his mother's work as a prostitute during his childhood, but there was no evidence that he himself was abused or neglected).

In a leading case, the Supreme Court found that the petitioner, Wiggins, was prejudiced by his defense counsel's failure to present evidence that he "experienced severe

---

[63] Jackson's lawyer also failed to present medical evidence going to his ability to think clearly at the time he committed the crime. We held, however, that this evidence "was prejudicial *as well*." *Id.* (emphasis added).

privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother." *Wiggins*, 539 U.S. at 534–35. It added that he "suffered physical torment, sexual molestation, and repeated rape," and had been homeless. *Id.* at 535. In another case, the Supreme Court found that the petitioner, Rompilla, was prejudiced by his defense counsel's failure to discover that he was raised by parents with serious drinking problems who fought violently, that his father "beat him when he was young with his hands, fists, leather straps, belts and sticks," that he received verbal abuse rather than expressions of affection, and that he lived in squalor.[64] *Rompilla*, 545 U.S. at 391–93. Although Doe's life was, of course, different than Wiggins's and Rompilla's, he, too, clearly "has the kind of troubled history we have declared relevant to assessing a defendant's moral culpability." *Wiggins*, 539 U.S. at 535.

## VI. Causal Nexus and Rebuttal Evidence

The state offers two additional arguments against our conclusion that J.B.'s deficient penalty-phase performance prejudiced Doe.

First, it argues that J.B.'s failure to introduce evidence of the abuse Doe suffered – both as a child and in prison – cannot have prejudiced him because this evidence could not

---

[64] Rompilla also had organic brain damage. *Rompilla*, 545 U.S. at 392. However, there is no indication that this was a determinative factor in the Supreme Court's analysis, or even – buried as it is in a list of other unintroduced mitigating evidence – that it was more significant than any of the rest of it. To assume otherwise would be to assume, contrary to the Supreme Court's express statements, that penalty-phase mitigating evidence will carry weight only when it offers a causative explanation for the offense.

have explained why he committed the offense. This argument fails both as a matter of fact and as a matter of law. The declarations of the two psychological experts retained by habeas counsel would have offered jurors a way to understand (though of course not to justify) Doe's aggression as the product of repeated brutalization that left him suffering from PTSD. Additionally, both we and the Supreme Court have recognized that while demonstrating such a causative "nexus" between painful life experiences and the commission of the offense is one way in which mitigating evidence can be expected to alter a sentencing outcome, it is certainly not the only one. *Tennard v. Dretke*, 542 U.S. 274, 286–87 (2004); *see also Smith v. Texas,* 543 U.S. 37, 45 (2004) (stating that the nexus test is a test that the Supreme Court "never countenanced and now ha[s] unequivocally rejected," and that this holding was "plain under [its] precedents"); *Styers v. Schriro*, 547 F.3d 1026, 1035 (9th Cir. 2008) ("In applying this type of nexus test to conclude that [the defendant's] post traumatic stress disorder did not qualify as mitigating evidence, the Arizona Supreme [C]ourt appears to have imposed a test directly contrary to the constitutional requirement that all relevant mitigating evidence be considered by the sentencing body.").

Unlike at the guilt phase, where the primary focus is on evidence offering a causative explanation, which might reduce formal culpability, mitigating evidence at the penalty phase also serves to increase jurors' sympathy for or comprehension of the lives, and crimes, of defendants who have themselves suffered terribly. *Sears*, 561 U.S. at 951. It is well established that "[w]hile the question of innocence or guilt of the offense is essentially a question of fact, the choice between life imprisonment and capital punishment is both a question of underlying fact and a matter of reasoned moral

judgment." *Sawyer v. Whitley*, 505 U.S. 333, 370 (1992).
"Evidence regarding social background and mental health,"
such as the evidence that J.B. failed to present, is necessary
to allow jurors to exercise reasoned moral judgment.
*Douglas*, 316 F.3d at 1090. "Only then can we be sure that
the sentencer has treated the defendant as a 'uniquely
individual human bein[g]' and has made a reliable
determination that death is the appropriate sentence." *Penry*,
492 U.S. at 319 (quoting *Woodson*, 428 U.S. at 304).

Second, the state argues that the strength of the mitigating
evidence that went unheard at trial should be discounted to
the extent that it would have opened the door to potentially
damaging rebuttal evidence.[65] There are three specific pieces
of evidence at issue, suggesting but offering no proof that
Doe had himself committed sexual assaults. All three would
likely have been inadmissible, and none would have been
inconsistent with the mitigation evidence discussed above.

The first is a warrant issued for Doe's arrest in his home
state in connection with a rape; he was never arrested,
charged or convicted. The bare fact that Doe was suspected
of rape *did* in fact come in during the penalty phase of the

---

[65] The state actually makes two arguments about this rebuttal evidence.
The first is that it would serve to counterbalance the unintroduced
mitigating evidence, thereby limiting prejudice. The second goes instead
to the first prong of the ineffective assistance analysis: the deficiency of
J.B.'s performance. The state suggests that had he known about both the
mitigating evidence and the rebuttal evidence it might draw, he would
have chosen to put on only the same limited mitigation presentation he
offered at trial. When asked about this during the habeas hearing, J.B. said
that this rebuttal evidence would not have made it more difficult for him
to present evidence of Doe's victimization to the jury. We see no reason
to second-guess his assessment.

trial, in order to rebut a character witness. The trial judge excluded all details of the alleged offense, which the state sought to introduce in order to rebut evidence of his good character – a purpose for which it would, at least, have been relevant.

We doubt whether this evidence, ruled inadmissible for the purpose of demonstrating Doe's bad character, would have been admissible to rebut the mitigating evidence related to his rape in prison, because evidence that Doe might have been the *perpetrator* of a rape *outside of prison* would have done nothing to undermine a showing that he himself had been the *victim* of rape *in prison*. *See People v. Mitcham*, 824 P.2d 1277, 1308 (Cal. 1992) (in bank) ("[W]e caution[] . . . that the scope of rebuttal must be specific, and evidence presented or argued as rebuttal must relate directly to a particular incident or character trait defendant offers in his own behalf . . . ." (internal quotation marks omitted)). The already-materialized risk that the jury would hear that Doe was accused of rape would not have dissuaded counsel from presenting additional mitigation, nor would it have substantially undermined that presentation. *See Correll*, 539 F.3d at 955 (rejecting the argument that because the prosecution could have presented "very damaging evidence in rebuttal," defense counsel's failure to present mitigating evidence was not prejudicial, because "a significant portion of that damaging rebuttal evidence was already available through the pre-sentence report").

The second piece of rebuttal evidence is a two-page document from Doe's prison file, reflecting that he received a disciplinary infraction for being a member (though not a leader) of a group of prisoners allegedly involved in forcing others in a particular unit to engage in sexual acts. The form

attributes these assaults to the group as a whole, and includes no statements about particular incidents nor about any specific acts of Doe's. This is the only allegation of such behavior in his voluminous prison file, and is substantiated by no other evidence. The state's brief refers to it, tellingly, as an "indication." The third piece of evidence is the mention in a probation report that during Doe's detention in a California jail prior to his murder trial, another prisoner asked to be moved, alleging that Doe propositioned him for sex and threatened to initiate sex without consent. There is no suggestion that anything further occurred, and his "[i]nmate records reflect no disciplinary action was taken on this instance."

Though these latter two pieces of evidence are perhaps more likely to have been admissible on relevance grounds, as they concern sexual abuse Doe allegedly perpetrated while confined, their unreliability might well have barred their introduction. *See People v. Martinez*, 74 P.3d 748, 762 (Cal. 2003). Even if this evidence was properly admissible, the jury would likely have given it little weight, given that neither of the reports was detailed or supported by any additional evidence, Doe's role in the first incident was very unclear, and the second report did not even allege an actual assault.

Furthermore, it is well known that sexual abuse can beget sexual abuse. Suggestions that Doe became sexually aggressive after being raped would actually have supported, not contradicted, the testimony of Dr. J.C. and E.P. about the effect of the trauma Doe suffered on his behavior, and the evidence in multiple declarations about the power structure in prison that he was forced to learn, in order to survive. Both experts reported that people who are raped in prison often act out sexually; the fact that such prisoners often attempt to

reassert control and protect themselves in this way is widely recognized by scholars,[66] by human rights organizations,[67] and by Congress.[68]

We are confident that this evidence, even if it were admissible, would not have substantially weakened the mitigation presentation that J.B. could have – and should have – put on. The added value of a meaningful mitigation presentation would, in Doe's case, have far outweighed the

---

[66] Robert W. Dumond, *Confronting America's Most Ignored Crime Problem: The Prison Rape Elimination Act of 2003*, 31 J. Am. Acad. Psychiatry & L. 354, 355 (2003) ("It has been shown that targets of sexual aggression may act out violently themselves, making the transition from victim to aggressor in an effort to avoid further victimization . . . ." (citations omitted)).

[67] Human Rights Watch, *No Escape: Male Rape in U.S. Prisons* 89 (Apr. 2001) ("The best and sometimes the only way to avoid the repetition of sexual abuse, many prisoners assert, is to strike back violently. Simply put, to prove that one is not a victim, one must take on the characteristics of a perpetrator.")

[68] Prison Rape Elimination Act of 2003, Pub. L. No. 108-79, § 2, 117 Stat. 972, 973–74 ("Prison rape endangers the public safety by making brutalized inmates more likely to commit crimes when they are released . . . . The high incidence of prison rape . . . increases substantially . . . the risk of recidivism, civil strife, and violent crime by individuals who have been brutalized by prison rape."); 149 Cong. Rec. E758 (daily ed. Apr. 11, 2003) (statement of Rep. Frank R. Wolf) ("Prison rape causes psychological trauma, which may lead its victims to act out in an aggressive manner upon leaving prison, possibly committing further crimes which will result in their reincarceration . . . . Prison rape perpetuates a vicious cycle of violence and trauma which starts with a prisoner being raped and that prisoner often committing acts of aggression and sexual harassment either within prison or in the community upon his release.").

risk of rebuttal.**[69]** We conclude that there is at least a reasonable probability that after considering this mitigating and rebuttal evidence, the jury would have decided that Doe should not be executed.

## VII.  Conclusion

Doe received profoundly deficient assistance of counsel during the penalty phase of his trial: while very strong mitigating evidence existed, it was never uncovered by J.B., and the resulting presentation was so anemic as to be virtually without value. These failures were due, defense counsel readily admits, not to any sort of strategic judgment but rather to incompetence.

In some cases, we have found that although defense counsel's investigation was inadequate, the evidence he would have discovered would have been, though extensive, largely duplicative. *See, e.g.*, *Miles*, 713 F.3d at 492–93 ("Petitioner's additional social history is, as the district court

---

**[69]** *Cf. Wong v. Belmontes*, 558 U.S. 15, 17, 19–26 (2009) (holding that a capital defendant could not show prejudice because his lawyer decided not to present mitigating evidence that was largely duplicative of the substantial quantity of penalty-phase evidence already presented, after being warned explicitly by the trial judge that doing so would open the door to the introduction of extensive and compelling evidence that his client had committed – and boasted about – another, execution-style, murder); *Allen v. Woodford*, 395 F.3d 979, 984–85 (9th Cir. 2005) (holding that unintroduced mitigating evidence of questionable value and offered by easily impeached witnesses was insufficient to outweigh "the extraordinarily damaging aggravating evidence . . . that [the defendant] had just been convicted by his death-qualified jury of orchestrating – from jail – a conspiracy to murder seven people, and succeeding in the actual killing of three, all to retaliate for their prior testimony against him and to prevent future damaging testimony . . . .").

noted, largely cumulative of what was already before the sentencing judge in the [pre-sentence report], meaning that its mitigating value would be marginal."). However, the jury that sentenced Doe was utterly unaware of his brutalization in prison and resulting mental illness, as well as the abuse and neglect he suffered during childhood. This unintroduced evidence, far from being duplicative, would have radically altered the mitigation presentation at trial.

In Doe's case, the evidence procured and introduced by habeas counsel "adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury."[70] *Rompilla*, 545 U.S. at 393. "[A]lthough we suppose it is [hypothetically] possible that a jury could have heard it all and still have decided on the death penalty, that is not the test." *Id.* The jury at Doe's trial was presented with relatively weak evidence in aggravation, and little evidence in mitigation, and chose death. Had J.B. conducted an adequate investigation, the jury would have heard, instead, an extremely compelling mitigation presentation (and little if any additional evidence in aggravation). "[T]he discrepancy

---

[70] This is indeed how the prosecutor characterized J.B.'s mitigation presentation at closing argument:

> I don't think you are going to hear any strong argument from the defense that you have heard evidence that mitigates the murder of [L.R.]. I don't think you are going to be able to find that you have heard anything, any factors in mitigation that can outweigh the factors in aggravation. I think what you are going to hear is a plea for mercy.

J.B. did not dispute it: "Ladies and gentlemen, [the prosecutor] is right. I am going to plead for to you [sic] choose life. I am going plead [sic]. I do plead for you to choose life."

between what counsel did investigate and present and what counsel could have investigated and presented" was massive. *Stankewitz*, 365 F.3d at 716. It is far more likely than not that the jury would have been swayed, resulting in a failure to impose a sentence of death. Especially given that AEDPA does not apply to this case, it is not a close one. Doe was prejudiced by J.B.'s failure to investigate and present mitigating evidence.

Upon learning of the evidence he failed to discover in representing Doe – his first capital client – J.B., to his credit, acknowledged as much:

> [M]y investigation and my representation of [Doe] at the penalty phase of his trial were inadequate. I believe that a compelling argument could and should have been made to a jury on his behalf that his life should not be taken by the State of California. It appears that his family's multi-generational history of abuse and neglect had continued, and it was inflicted upon [Doe] virtually from the time of his conception and continued through childhood and into adolescence. When he was sent . . . [to prison] he was [a] teenager, but he was placed with the worst of the worst of that state and suffered literally unspeakable abuse. If his jury had heard that evidence they might well have chosen to spare his life.

"[T]he mitigating evidence was there," he concluded – and it was "compelling" – "but the jury never got to hear it."

\* \* \*

The judgment of the district court is affirmed in part and reversed in part. We remand with instructions to grant the writ with respect to the penalty phase and return the case to the state court to reduce Doe's sentence to life without parole, unless the State of California elects to pursue a new capital sentencing proceeding within a reasonable amount of time as determined by the district court.

**AFFIRMED in part, REVERSED in part, and REMANDED.**

Each party shall bear its own costs on appeal.